[No. G041545. Fourth Dist., Div. Three. Dec. 14, 2010.]

CITY OF ARCADIA et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Appellants;
NATURAL RESOURCES DEFENSE COUNCIL et al., Interveners and
Appellants.

## COUNSEL

Rutan & Tucker, Richard Montevideo and Peter J. Howell for Plaintiffs and Appellants.

Andrea Sheridan Ordin, County Counsel (Los Angeles), Judith A. Fries and Laurie E. Dods, Deputy County Counsel; Burhenn & Gest, Howard Gest and David W. Burhenn for County of Los Angeles and Los Angeles County Flood Control District as Amici Curiae on behalf of Plaintiffs and Appellants.

Downey Brand, Melissa A. Thorme; Archer Norris and Peter W. McGaw for California Association of Sanitation Agencies as Amicus Curiae on behalf of Plaintiffs and Appellants.

Aleshire & Wynder, David J. Aleshire and Wesley A. Miliband for League of California Cities, California Contract Cities Association and California State Association of Counties as Amici Curiae on behalf of Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Jennifer F. Novak and Michael W. Hughes, Deputy Attorneys General, for Defendants and Appellants.

David S. Beckman, Michelle S. Mehta and Noah J. Garrison for Interveners and Appellants.

**OPINION**

**RYLAARSDAM, Acting P. J.**—This case concerns the construction and application of the federal Clean Water Act of 1977 (Clean Water Act; 33 U.S.C. § 1251 et seq.) and the Porter-Cologne Water Quality Control Act (Porter-Cologne Act; Wat. Code, § 13000 et seq.; unless otherwise stated, all further statutory references are to the Water Code).

The superior court entered a judgment issuing a writ of mandate that vacated a resolution by defendant California Regional Water Quality Control Board, Los Angeles Region (Regional Board) after it completed a periodic review of its water quality control plan. The judgment further directed Regional Board to either reopen the prior review proceeding or, during its next scheduled periodic review, conduct a public hearing on the plan's water quality objectives applicable to storm water or urban runoff and, if necessary, revise those objectives in light of the factors listed in sections 13000 and 13241 of the Porter-Cologne Act. In addition, the court barred Regional Board from basing its water quality objectives on "potential" beneficial uses of water bodies covered by the water quality control plan. However, in so ruling the trial court allowed defendants to continue using the current water quality control plan to avoid any "unintended consequences which . . . may result from immediately halting[,] . . . implementation, application and/or enforcement of the . . . [p]lan . . . ."

Defendants State Water Resources Control Board (State Board) and Regional Board, and interveners Natural Resources Defense Council, Santa Monica Baykeeper, and Heal the Bay, challenge the judgment on several

grounds, including statute of limitations and collateral estoppel, as well as the merits of the court's decision. Plaintiffs, 18 Los Angeles County municipalities[*] and Building Industry Legal Defense Foundation (BILDF), a nonprofit corporation representing the construction industry, challenge only the court's ruling that defendants may enforce the current water quality control plan pending further review proceedings.

We conclude defendants and interveners' collateral estoppel claim and their substantive arguments have merit and reverse the judgment. As a consequence, plaintiffs' appeal is moot.

## STATUTORY BACKGROUND

Several appellate court decisions have summarized what has been described as "the complicated web of federal and state laws and regulations concerning water pollution . . . ." (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1380 [38 Cal.Rptr.3d 450].) The following is a summary of the overall statutory framework.

### 1. The Clean Water Act

"In 1972, Congress enacted amendments [citation] to the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), which, as amended in 1977, is commonly known as the Clean Water Act. The Clean Water Act is a 'comprehensive water quality statute designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." ' [Citation.]" (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619–620 [26 Cal.Rptr.3d 304, 108 P.3d 862].)

The Clean Water Act's primary goal is to eliminate "the discharge of pollutants into . . . navigable waters . . . ." (33 U.S.C. § 1251(a)(1).) "To accomplish this goal, the Act [has] established 'effluent limitations,' which are restrictions on the 'quantities, rates, and concentrations of chemical, physical, biological, and other constituents'; these effluent limitations allow the discharge of pollutants only when the water has been satisfactorily treated to conform with federal water quality standards. [Citations.]" (*City of Burbank v. State Water Resources Control Bd., supra,* 35 Cal.4th at p. 620; see also *Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1093 [1 Cal.Rptr.3d 76] [" 'Effluent limitations are a means of *achieving* water quality standards.' "]; 33 U.S.C. §§ 1311, 1362(11).)

---

[*]In addition to Arcadia, the cities include Bellflower, Carson, Cerritos, Claremont, Commerce, Downey, Duarte, Glendora, Hawaiian Gardens, Irwindale, Lawndale, Monterey Park, Paramount, Santa Fe Springs, Signal Hill, Vernon, and Whittier.

"Part of the federal Clean Water Act is the National Pollutant Discharge Elimination System (NPDES), '[t]he primary means' for enforcing effluent limitations and standards under the Clean Water Act. [Citation.] The NPDES sets out the conditions under which the federal EPA [Environmental Protection Agency] or a state with an approved water quality control program can issue permits for the discharge of pollutants in wastewater. [Citation.]" (*City of Burbank v. State Water Resources Control Bd., supra*, 35 Cal.4th at p. 621.) National Pollutant Discharge Elimination System (NPDES) permits must be renewed every five years. (33 U.S.C. § 1342(b)(1)(B); Wat. Code, § 13380.)

"[T]he proper scope of the controls in an NPDES permit depends on the applicable state water quality standards for the affected water bodies. [Citation.]" (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 873 [22 Cal.Rptr.3d 128].) "Under the . . . NPDES permit system, the states are required to develop *water quality standards*. [Citations.] A water quality standard 'establish[es] the desired condition of a waterway.' [Citation.] A water quality standard for any given waterway, or 'water body,' has two components: (1) the designated beneficial uses of the water body and (2) the *water quality criteria* sufficient to protect those uses. [Citations.]" (*Communities for a Better Environment v. State Water Resources Control Bd., supra*, 109 Cal.App.4th at p. 1092; see also 33 U.S.C. § 1313(a), (c)(2)(A); 40 C.F.R. § 131.3(i) (2010).)

The Clean Water Act also requires states to "identify those waters within its boundaries for which the effluent limitations required by [the Act] are not stringent enough to implement any water quality standard applicable to such waters." (33 U.S.C. § 1313(d)(1)(A).) "This list of substandard waters is known as the '303(d) list' . . . ." (*City of Arcadia v. U.S. Environmental Protection Agency* (9th Cir. 2005) 411 F.3d 1103, 1105.) For these impaired water bodies a state must "establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters" (33 U.S.C. § 1313(d)(1)(A)), and "the total maximum daily load (TMDL) . . . for those pollutants . . . at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." (33 U.S.C. § 1313(d)(1)(C); see also *City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1404 [38 Cal.Rptr.3d 373].)

" 'A TMDL defines the specified maximum amount of a pollutant which can be discharged or "loaded" into the waters at issue from all combined sources.' [Citation.] 'A TMDL must be "established at a level necessary to implement the applicable water quality standards . . . ." [Citation.] A TMDL assigns a *waste load allocation* . . . to each point source, which is that portion

of the TMDL's total pollutant load, which is allocated to a point source for which an NPDES permit is required. [Citation.] Once a TMDL is developed, effluent limitations in NPDES permits must be consistent with the [waste load allocations] in the TMDL.' [Citations.] A TMDL requires a 'margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.' [Citation.]" (*City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th at pp. 1404–1405, fn. omitted.)

## 2. The Porter-Cologne Act

"In California, the controlling law is the Porter-Cologne Water Quality Control Act . . . . [Citation.] Its goal is 'to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible.' (§ 13000.) The task of accomplishing this belongs to the State Water Resources Control Board (State Board) and the nine Regional Water Quality Control Boards; together the State Board and the regional boards comprise 'the principal state agencies with primary responsibility for the coordination and control of water quality.' (§ 13001.) . . . [¶] Whereas the State Board establishes statewide policy for water quality control (§ 13140), the regional boards 'formulate and adopt water quality control plans for all areas within [a] region' (§ 13240). The regional boards' water quality plans, called 'basin plans,' must address the beneficial uses to be protected as well as water quality objectives, and they must establish a program of implementation. (§ 13050, subd. (j).)" (*City of Burbank v. State Water Resources Control Bd., supra*, 35 Cal.4th at p. 619, fns. omitted.) The Porter-Cologne Act defines "water quality objectives" to mean "the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area." (§ 13050, subd. (h).)

A basin plan must conform to state policy for water quality control established by defendant State Board, plus be submitted to that board for approval before becoming effective. (§§ 13140, 13141, 13245.) The plan must also be "periodically reviewed" (§ 13143) at least every three years (33 U.S.C. § 1313(c)(1)), at which time it "may be revised" by the board (§ 13143).

"Shortly after Congress enacted the Clean Water Act . . . , the California Legislature added chapter 5.5 to the Porter-Cologne Act, for the purpose of adopting the necessary federal requirements to ensure it would obtain EPA approval to issue NPDES permits. [(§ 13370, subd. (c).)] As part of these amendments, the Legislature provided that the state and regional water boards

'shall, as required or authorized by the [Clean Water Act], issue waste discharge requirements . . . which apply and ensure compliance with all applicable provisions [of the Clean Water Act], together with any more stringent effluent standards or limitations necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance.' [(§ 13377.)] . . . [S]ection 13374 provides that '[t]he term "waste discharge requirements" as referred to in this division is the equivalent of the term "permits" as used in the [Clean Water Act].' [¶] California subsequently obtained the required approval to issue NPDES permits. [Citation.] Thus, the waste discharge requirements issued by the regional water boards ordinarily also serve as NPDES permits under federal law. [(§ 13374.)]" (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd., supra*, 124 Cal.App.4th at p. 875.)

## FACTS AND PROCEDURAL BACKGROUND

As noted, Regional Board is one of nine regional water quality control boards created by the Porter-Cologne Act. (§ 13200, subd. (d).) In 1975, it adopted two basin plans, one covering the Santa Clarita River basin and a second covering the Los Angeles River basin. Chapter 9 of the plans, which set forth the policies and guidelines governing the formulation and adoption of a water quality control plan, stated a plan must include "such water quality objectives as in [the regional board's] judgment will ensure reasonable protection of beneficial uses . . . ," including "[p]ast, present and probable future beneficial uses[,] [¶] . . . [e]nvironmental characteristics of the area, including quality of water supply[,] [¶] . . . [w]ater quality that could reasonably be achieved[,] [¶] . . . [and] [e]conomic considerations." In approving Regional Board's 1975 basin plans, State Board issued a resolution declaring, in part, "the water quality control plans include[] all necessary elements of a water quality control plan in accordance with [s]ections 13241 and 13242 . . . and federal requirements . . . ."

In 1987, Congress extended the Clean Water Act to cover storm water from "municipal storm sewers," requiring permits for these discharges to "reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the . . . State determines appropriate for the control of such pollutants." (33 U.S.C. § 1342(p)(3)(B)(iii).) The EPA (Environmental Protection Agency) defines storm water to "mean[] storm water runoff, snow melt runoff, and surface runoff and drainage." (40 C.F.R. § 122.26(b)(13) (2010).)

Regional Board issued a permit in 1990, described as an MS4, naming the County of Los Angeles and the incorporated cities located within the county

as permittees. BILDF's members were also subjected to storm water and urban runoff permits related to construction activity.

In 1994, Regional Board conducted a review of the basin plans, and consolidated the two original plans into a single one, revising it to cover storm water and urban runoff. Although the 1994 amendment implemented a change of policy towards using a watershed-based water quality control plan, a staff report stated "[m]ost of the water quality objectives are not being changed from the existing Basin Plan[]." (Underscoring omitted.)

The revised plan's chapter on water quality objectives cited "California Water Code []§ 13241[]" as "specif[ying] that each Regional Water Quality Control Board shall establish water quality objectives," which the plan defined "as 'the allowable limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area.' " Concerning storm water and urban runoff, the 1994 plan identified and proposed to "implement[] . . . [b]est [m]anagement [p]ractices." State Board approved the 1994 update of the basin plan.

In 1996, Regional Board issued a renewal of the MS4 permit for Los Angeles County and the cities within it. The permit's findings acknowledged the 1994 basin plan's shift to a watershed management approach described as "provid[ing] a comprehensive and integrated strategy towards water resource protection, enhancement, and restoration while balancing economic and environmental impacts within a hydrologically defined drainage basin," and "emphasiz[ing] cooperative relationships between regulatory agencies, the regulated community, . . . and other stakeholders in the watershed to achieve the greatest environmental improvements with the resources available." The permit also focused on the use of best management practices to minimize pollution from storm water and urban runoff.

On December 13, 2001, Regional Board again renewed the MS4 permit for plaintiff cities. The permit contained several pages of findings, including the following: (1) In 1999, the EPA "entered into a consent decree with [several environmental groups] . . . under which the Regional Board must adopt all TMDLs for the Los Angeles Region within 13 years . . . ." "This permit incorporates a provision to implement and enforce approved load a[l]locations for municipal storm water discharges and requires amending the [Stormwater Quality Management Plan] after pollutants loads have been allocated and approved"; (2) the EPA "established numeric criteria for priority toxic pollutants for the State of California (California Toxics Rule (CTR))" and thereafter, "[t]he State Board adopted" both a policy "requir[ing] that discharges comply with TMDL-derived load allocations as soon as possible but

no later than 20 years from the [policy's] effective date," plus "a revised Water Quality Control Plan for Ocean Waters of California" that "contains water quality objectives which apply to all discharges to the coastal waters of California"; (3) in September 2001, "Regional Board . . . adopted amendments to the Basin Plan, to incorporate TMDLs for trash in the Los Angeles River . . . and Ballona Creek" and stated it had "considered the requirements of [section] 13263 and [section] 13241, and applicable plans, policies, rules, and regulations in developing these waste discharge requirements." The permit also contained provisions describing the duties of "[p]ermittees subject to the forthcoming trash TMDL."

In 2002, Regional Board approved an amendment to the basin plan's water quality objectives concerning bacteria levels in water bodies designated for recreational use. The resolution approving this change found "[t]he Federal Clean Water Act . . . requires . . . []Regional Board[] to develop water quality objectives which are sufficient to protect beneficial uses designated for each water body . . . within its region"; "[t]he current Basin Plan contains . . . bacteria objectives to protect waters designated for water contact recreation based on recommendations made by the U.S. EPA in 1976"; the amendment "is based on more recent epidemiological studies and research on the most appropriate bacterial indicators"; "[b]ased on these epidemiological studies, . . . the U.S. EPA revised its recommended bacteria criteria for waters designated for water contact recreation," plus made a "commitment" "to promulgate the [revised] criteria with the goal of assuring that the . . . criteria apply" if "a State does not amend its water quality standards to include the [revised] criteria," and "EPA's . . . bacteria criteria [plus] the bacteria standards contained in the California Code of Regulations . . . represent the best science available." The resolution further noted the amendment "was developed in accordance with section 13241 of the Porter-Cologne . . . Act," and "Regional Board . . . considered the costs of implementing the amendment, and f[ound] these costs to be a reasonable burden relative to the environmental benefits."

In 2004, Regional Board conducted a triennial review of the basin plan. Representatives of cities, public works and sanitation districts, and the construction industry responded to requests for public input.

One letter, from an employee of plaintiff City of Signal Hill, contained the following comments: "The current Basin Plan has not been comprehensively updated since 1994. The Regional Board has relied upon a 'patchwork' of amendments, which bear no relationship to the whole document. . . . We believe that a comprehensive update of the Basin Plan under the 2004 Triennial Review is necessary since much has changed in the regulatory environment, [i]ncluding EPA entering into the Consent Decree in 1998 and

the Amended Consent Decree in 1999. [¶] There have been significant changes to the 303(d) [L]ist, expanding the list of water bodies and constituents to be regulated. . . . Further, the regulatory framework is significantly altered with EPA's adoption of the California Toxic Rule and the apparent decision of the Regional Board, in the Metals TMDL for the Los Angeles River, to apply these standards unreasonably to storm[]water. [¶] Finally, the Basin Plan's water quality objectives were not developed based on 'past, present, and probable future beneficial uses,' as required under the Water Code, but instead, appear[] to have been developed and based on 'potential' beneficial uses."

Another letter from employees of other county and city agencies and construction industry organizations requested the 2004 review develop "protocols . . . to ensure that existing and future Basin Plan water quality standards are consistently and substantively assessed in accordance with [the] Porter-Cologne [Act] [s]ection[s] 13000 and . . . 13241 factors," and stated "[c]lear, rational criteria should be developed for creating and applying beneficial use designations, including the revision of current Basin Plan 'potential' use designations."

In March 2005, after several public meetings, Regional Board prepared a 66-page responsiveness summary to comments received from stakeholders and issued a resolution approving a list of 20 basin planning issues to be addressed during the following three years. It declined to revise or amend the basin plan or eliminate its application to potential beneficial uses of the water bodies covered by the plan.

Plaintiffs filed this action on December 9, 2005. The petition alleges eight causes of action, alternatively seeking issuance of a writ of mandate, plus declaratory and injunctive relief as to four purported defects. The first and second counts alleged defendants "failed to hold a public hearing for the purpose of reviewing applicable water quality standards/objectives, and where appropriate, modifying and revising such water quality standards/objectives" during the triennial review "contrary to law . . . ." The third and fourth counts sought the same relief based on defendants' alleged failure "to correct deficiencies, defects and improperly . . . adopted, maintained and applied . . . standards/objectives . . . based on 'potential' beneficial use designations, as opposed to existing uses, uses to be made of the waters, or probable future beneficial uses." The fifth and sixth causes of action sought the same relief, alleging the triennial review failed to comply with sections 13000 and 13241. Finally, the seventh and eighth counts alleged the "water quality standards/objectives contain numerous beneficial 'potential' . . . use designations," and thus "were developed and adopted, and are being maintained and applied without compliance with the requirements of . . . [sections] 13000 . . . and 13241. . . ."

Defendants unsuccessfully demurred and moved to strike the petition, in part arguing the applicable statute of limitations barred plaintiffs' claims. After defendants answered the petition, the court conducted a hearing on it. The court issued a notice of ruling that granted the writ on all causes of action "as to water quality [s]tandards and objectives of the [b]asin [p]lan as those [s]tandards and objectives affect storm water discharges and urban runoff." (Underscoring omitted.)

Initially, the court rejected defendants' claims plaintiffs' action was barred by the statute of limitations, res judicata or collateral estoppel. It also held plaintiffs were not barred by their failure to file administrative challenges to the 1990 and 1996 MS4 permits issued by Regional Board, finding it is "the adoption of the TMDLs followed by their incorporation into the NPDES permit that triggers the application of the [s]tandards."

On the merits, the court held defendants erred both by considering "'potential' future uses" and by applying "[t]he [s]tandards . . . without appropriate consideration of the 13241/13000 factors." As to the latter ruling, the court stated "[t]here is no substantial evidence showing that the [b]oards considered the 13241/13000 factors before applying the [s]tandards to storm water in the 1975 [p]lan [a]doption, the 1994 [a]mendment, or the 2002 [b]acterial [o]bjectives." Finally, the court held "[t]he 2004 [triennial review] was the appropriate vehicle at the appropriate time for the [b]oard to consider the . . . factors. . . ."

Before the court entered judgment, interveners successfully sought to intervene in the case. The initial judgment directed issuance of a writ of mandate that, in part, required boards "to cease and desist, and suspend all activities relating to the implementation, application, and/or enforcement in the [b]asin [p]lan" to either "achieve 'potential' beneficial uses" or to apply water quality objectives "whether through TMDLs or other [b]asin [p]lan amendments or regulations, or through NPDES permits . . . until such time as [the boards] have reviewed and, where appropriate, revised the[s]tandards in light of the factors and requirements provided under . . . sections 13241 and 13000 . . . ."

Defendants and interveners moved for a new trial and interveners also moved to vacate the judgment. The trial court denied the new trial motions but, expressing "concern[] about [the] unintended consequences which . . . may result from immediate halting of all implementation, application and/or enforcement of the [s]tandards in the [b]asin [p]lan as applied . . . to [s]torm[]water," exercised its authority under Code of Civil Procedure section 662 to "vacate[] the [original] judgment and writ" and enter "a new judgment . . . that follows the 'remand without vacatur' procedure," thereby permitting defendants "to use the [s]tandards pending review . . . ."

The final judgment as described above and a writ of mandate were entered November 10, 2008.

## DISCUSSION

### 1. *Standard of Review*

When an administrative agency establishes regulations to implement state policy its action is subject to review by traditional mandamus under Code of Civil Procedure section 1085. (*San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1117–1118 [108 Cal.Rptr.3d 290]; *City of Arcadia v. State Water Resources Control Bd., supra,* 135 Cal.App.4th at p. 1408.) Subdivision (a) of that statute declares "[a] writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." " ' " '[R]eview is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support,' " . . . [and] [t]he petitioner has the burden of proof to show that the decision is unreasonable or invalid as a matter of law. [Citation.] We review the record de novo except where the trial court made foundational factual findings, which are binding on appeal if supported by substantial evidence.' [Citation.]" (*City of Arcadia v. State Water Resources Control Bd., supra,* 135 Cal.App.4th at p. 1409.)

"*If* the agency's action depends solely upon the correct interpretation of a statute, that is a question of law upon which the court exercises its independent judgment. [Citation.] In doing so, however, we are guided by the principle that an ' "administrative [agency's] interpretation [of controlling statutes] . . . will be accorded great respect by the courts and will be followed if not clearly erroneous." ' [Citations.]" (*Wirth v. State of California* (2006) 142 Cal.App.4th 131, 138 [47 Cal.Rptr.3d 623].)

### 2. *Statute of Limitations*

In overruling the State and Regional Boards' demurrer to the petition, the trial court held "[t]he applicable state of limitations . . . is four years," not Code of Civil Procedure section 338's three-year period, finding "[t]here is no 'liability created by statute' " because "[p]etitioners are challenging what they claim to be an illegal regulation that did not impact them . . . until . . . the last of several TMDLs were adopted . . . ." In its posttrial decision the court also noted the fifth, sixth, and eighth causes of action were not barred because they challenged defendants' 2004 triennial review approval, sought

"declaratory relief regarding future [b]asin [p]lan amendments," and defendants' failure to comply with their statutory duties constituted "a 'continuing violation' of an ongoing duty.' "

■ Both defendants and interveners challenge the court's ruling on the statute of limitations. As for the court's reliance on Code of Civil Procedure section 343's four-year period, it clearly erred. Plaintiffs' action is based on defendants' alleged noncompliance with their statutory obligations under the Clean Water Act and the Porter-Cologne Act. Code of Civil Procedure section 338, subdivision (a) declares a three-year limitations period applies to "[a]n action upon a liability created by statute . . . ."

But the real issue is when plaintiffs' causes of action accrued. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 815 [107 Cal.Rptr.2d 369, 23 P.3d 601] ["[A] cause of action accrues 'upon the occurrence of the last element essential to the cause of action.' "].) Under Code of Civil Procedure section 338, subdivision (a), to the extent plaintiffs' action can be construed as challenging the boards' pre-December 9, 2002 adoption and approval of the basin plan and amendments to it or the terms of the NDPES permits, their claims are barred. (*Howard Jarvis Taxpayers Assn. v. City of La Habra, supra*, 25 Cal.4th at p. 821 ["a declaratory judgment action or mandate petition to enforce a statutory liability must be brought within the same three-year period after accrual of the cause of action"].)

The trial court relied on *Jarvis*'s continuing violation exception to find plaintiffs' action was timely. In *Jarvis*, the Supreme Court recognized an exception to the foregoing rule where taxpayers challenged a city's enactment of a utility users tax without obtaining prior voter approval as required by Proposition 62 (Gov. Code, § 53720 et seq.). "[P]laintiffs have alleged an ongoing violation of Proposition 62's commands . . . over the validity of the utility tax," and "those causes of action are not barred merely because similar claims could have been made at earlier times as to earlier violations, or because plaintiffs do not at this time also seek a refund of taxes paid. [¶] . . . [¶] . . . Indeed, in the absence of an independent bar on equitable or writ relief, a person aggrieved by the required payment of a tax is not limited to seeking a refund, but may challenge the validity of the taxing agency's policy or continuing conduct by a claim for declaratory relief. [Citations.]" (*Howard Jarvis Taxpayers Assn. v. City of La Habra, supra*, 25 Cal.4th at pp. 821–822, fn. omitted.)

Defendants claim the continuing violation exception does not apply here, arguing "[t]his action was not about an application of water quality standards," but rather "was a belated, direct attack upon the . . . standards

themselves." Interveners argue *Jarvis* "was limited only to tax measures." Contrary to these assertions, the court did identify defendants' approval of the total maximum daily loads (TMDL's), most of which occurred within three years before this lawsuit was filed, as the application of the allegedly defective water quality objectives supporting plaintiffs' action. In addition, the Supreme Court later relied on *Jarvis* to allow an action by a property owner who filed a facial challenge to a county ordinance within 90 days after the county issued a permit that imposed restrictions on the construction of a second dwelling, even though the ordinance had been enacted nearly 20 years earlier. (*Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 768–769 [16 Cal.Rptr.3d 404, 94 P.3d 538].)

In any event, the court noted plaintiffs' action primarily challenged Regional Board's resolution on the 2004 triennial review without addressing their requests concerning the validity of the water quality objectives as well as the imposition of TMDL's under the current MS4 permit. Insofar as plaintiffs' action is limited to these claims it would appear to be timely.

3. *Collateral Estoppel*

Defendants cited portions of three prior judicial rulings they claimed collaterally estopped plaintiffs from arguing Regional Board had not considered section 13241 in adopting the 2001 NPDES MS4 permit and in subsequently approving the TMDL's for trash and metals. The trial court rejected these claims, concluding plaintiffs' prior actions "did not challenge the legality of applying [s]tandards to storm water without the [b]oards first appropriately considering the 13241/13000 factors." (Underscoring omitted.)

■ The trial court erred in declining to find some of plaintiffs' claims were barred by two of the prior decisions. "The doctrine of res judicata precludes the relitigation of certain matters which have been resolved in a prior proceeding under certain circumstances. [Citation.] Its purpose is 'to preserve the integrity of the judicial system, promote judicial economy, and protect litigants from harassment by vexatious litigation.' [Citations.] [¶] The doctrine has two aspects. It applies to both a previously litigated cause of action, referred to as claim preclusion, and to an issue necessarily decided in a prior action, referred to as issue preclusion. [Citations.] The prerequisite elements for applying the doctrine to either an entire cause of action or one or more issues are the same: (1) A claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding. [Citations.]" (*Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 556 [90 Cal.Rptr.2d 469].)

In *City of Arcadia v. State Water Resources Control Bd., supra,* 135 Cal.App.4th 1392, 12 of the cities involved in this action filed a petition for a writ of mandate challenging the defendants' adoption of the trash TMDL for municipal storm drains draining into the Los Angeles River, one of the alleged applications cited by the trial court in this case. The trial court in that case granted the writ, finding in part the defendants failed to consider the economic factors as required by section 13241.

The Court of Appeal reversed this portion of the ruling. On appeal, the defendants argued section 13241 was "inapplicable because the Trash TMDL does not establish water quality objectives, but merely implements, under . . . section 13242, the existing narrative water quality objectives in the 1994 Basin Plan." (*City of Arcadia v. State Water Resources Control Bd., supra,* 135 Cal.App.4th at p. 1415.) The plaintiff cities disagreed with this claim. The appellate court declined to decide which argument was correct, finding "even if the statute is applicable, the Water Boards sufficiently complied with it." (*Ibid.,* fn. omitted.) The opinion then proceeded to discuss in detail the economic factors considered in the trash TMDL. (*Id.* at pp. 1416–1418.)

In *County of Los Angeles v. California State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985 [50 Cal.Rptr.3d 619], Los Angeles County and the cities involved in this case, plus BILDF, sued the defendants challenging the adoption of the 2001 MS4 permit. Interveners also intervened and appeared. The trial court ruled for the defendants and the Court of Appeal affirmed the decision. The appellate court certified only a portion of its opinion for publication.

In the unpublished portion of its opinion the appellate court rejected the plaintiffs' claim section 13241 required "the regional board . . . to consider the economic impact of issuance of the permit." Citing to evidence in the record, it found the plaintiffs' contention lacked merit because, after reviewing the record, it concluded there was "substantial evidence the regional board considered the costs and benefits of implementation of the permit."

The third case defendants cite involved a February 2007 trial court statement of decision denying the petition of eight cities involved in the present case against the defendants challenging the 2005 adoption of a TMDL for metals in the Los Angeles River and its tributaries. While agreeing "the Water Boards were . . . required to examine the criteria in section 13241 in amending" "the basin plan in adopting the metals TDMLs," the trial court found "[t]he evidence supports th[e] conclusion" the defendants "did so (along with a protest that it was unnecessary)."

The two appellate court rulings resulted in final judgments. But neither defendants nor interveners cite to the existence of a final judgment in the

superior court matter. At best defendants claim the trial court's ruling was appealed, but there is no indication a final ruling has been rendered. While collateral estoppel can arise from a superior court judgment (7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, §§ 350, 351, pp. 962–963), the requirement of a final judgment is not satisfied as to the latter case.

■ But all of the elements for collateral estoppel exist as to the two appellate court rulings. In each case, the Court of Appeal considered whether the boards complied with section 13241 in approving a regulation applying to plaintiffs' storm sewers and concluded they had done so. As for privity, "In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication. [Citation.] Thus, in deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need for applying collateral estoppel in the particular case, in order to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, or to protect against vexatious litigation. [Citations.]" (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 875 [151 Cal.Rptr. 285, 587 P.2d 1098].) Under this standard, not only were many of the same municipalities and BILDF parties to the prior actions, privity clearly existed between the parties to the prior lawsuits and the parties in this case.

Plaintiffs argue and the trial court found no collateral estoppel on the ground neither decision applied the provisions of sections 13000 and 13241 to storm water. But, as discussed in greater depth below, the focus of the Clean Water Act is on setting criteria for water quality based on a water body's designated uses, not the source of discharges adversely affecting the body's water quality. "The states are required to set water quality standards for all waters within their boundaries regardless of the sources of the pollution entering the waters." (*Pronsolino v. Nastri* (9th Cir. 2002) 291 F.3d 1123, 1127, italics omitted; see also 33 U.S.C. § 1313(c)(2)(A) ["revised or new water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses"].) Thus, the trial court erred in failing to give collateral estoppel effect to the first and second appellate court decisions concerning the application of section 13241 to the 2001 MS4 permit and the adoption of the trash TMDL.

*4. The 2004 Triennial Review*

The trial court found defendants abused their discretion by declining plaintiffs' requests "to perform the [sections] 13241/13000 analysis at the 2004 T[riennial ]Review." In particular, the court found "[t]he [s]tandards cannot be applied to storm water without appropriate consideration of the 13241/13000 factors," and "[t]here is no substantial evidence showing that the [b]oards considered the[se] . . . factors before applying the [s]tandards to storm water in the 1975 [p]lan [a]doption, the 1994 [a]mendment, or the 2002 [b]acterial [o]bjectives." The court's finding is contradicted by both the foregoing decisions as well as the record in this case. In addition, it appears the court misunderstood the applicable legal requirements.

First, plaintiffs' allegations that Regional Board failed to conduct public hearings during the 2004 triennial review are contrary to the record. The administrative record reflects Regional Board conducted a series of public workshops that involved discussion of a list of priorities for the basin plan.

█ Second, to prevail, plaintiffs needed to show Regional Board had a duty to consider sections 13000 and 13241 when conducting its triennial review. " 'Two basic requirements are essential to the issuance of the writ [of mandate]: (1) A clear, present and usually ministerial duty upon the part of the respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty [citation]. [Citations.]' [Citations.]" (*Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 640 [39 Cal.Rptr.3d 62].) As for the first requirement, "[a] statute is deemed to impose a mandatory duty on a public official only if the statute affirmatively imposes the duty and provides implementing guidelines. [Citations.]" (*O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 510 [44 Cal.Rptr.3d 531].) " 'Whether a particular statute is intended to impose a mandatory duty . . . is a question of statutory interpretation for the courts.' [Citation.]" (*Ibid.*)

█ Section 13143 declares "[s]tate policy for water quality control shall be periodically reviewed and may be revised." (See also § 13240 [requiring basin plans "shall be periodically reviewed and may be revised"].) The Clean Water Act provides "the State water pollution control agency . . . shall from time to time (but at least once each three[-]year period . . .) hold public hearings for the purpose of reviewing applicable water quality standards and, as appropriate, modifying and adopting standards." (33 U.S.C. § 1313(c)(1).) Regional Board was required to conduct a review of its basin plan, but the foregoing statutes do not impose a duty to revise or modify it.

█ Regional Board was not obligated to consider the factors contained in sections 13000 and 13241 when conducting the basin plan's 2004 triennial

review. As for section 13000, it is not a basis for mandamus relief. That statute provides, "The Legislature finds and declares that the people of the state have a primary interest in the conservation, control, and utilization of the water resources of the state, and that the quality of all the waters of the state shall be protected for use and enjoyment by the people of the state[;] [¶] . . . that activities and factors which may affect the quality of the waters of the state shall be regulated to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible[;] [¶] . . . that the health, safety and welfare of the people of the state requires that there be a statewide program for the control of the quality of all the waters of the state; that the state must be prepared to exercise its full power and jurisdiction to protect the quality of waters in the state from degradation originating inside or outside the boundaries of the state; that the waters of the state are increasingly influenced by interbasin water development projects and other statewide considerations; that factors of precipitation, topography, population, recreation, agriculture, industry and economic development vary from region to region within the state; and that the statewide program for water quality control can be most effectively administered regionally, within a framework of statewide coordination and policy."

■ A statute containing "a general statement of legislative intent . . . does not impose any affirmative duty that would be enforceable through a writ of mandate. [Citations.]" (*Shamsian v. Department of Conservation, supra,* 136 Cal.App.4th at pp. 640–641; see also *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 444 [261 Cal.Rptr. 574, 777 P.2d 610] ["[t]he precatory declaration of intent expressed in the statute must be read in context" and "cannot be viewed as independently creating substantive duties . . . in addition to those imposed by the regulations"].) As for section 13000, that is the case. The trial court erred in declaring defendants had a duty to consider the statements of legislative intent found in section 13000 in adopting the MS4 permit and incorporating the TMDL requirements into it.

■ Section 13241 does impose obligations that can be enforced by a writ of mandate. It declares "[e]ach regional board shall establish such water quality objectives in water quality control plans as in its judgment will ensure the reasonable protection of beneficial uses and the prevention of nuisance; however, it is recognized that it may be possible for the quality of water to be changed to some degree without unreasonably affecting beneficial uses. Factors to be considered by a regional board in establishing water quality objectives shall include, but not necessarily be limited to, all of the following: [¶] (a) Past, present, and probable future beneficial uses of water. [¶] (b) Environmental characteristics of the hydrographic unit under consideration, including the quality of water available thereto. [¶] (c) Water quality

conditions that could reasonably be achieved through the coordinated control of all factors which affect water quality in the area. [¶] (d) Economic considerations. [¶] (e) The need for developing housing within the region. [¶] (f) The need to develop and use recycled water."

But this statute only requires consideration of the listed factors when "establishing water quality objectives . . . ." (§ 13241.) As noted, " '[w]ater quality objectives' " means "the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area." (§ 13050, subd. (h).) These objectives are only one element of a water quality control plan, which the Porter-Cologne Act defines as "a designation or establishment for the waters within a specified area of all of the following: [¶] (1) Beneficial uses to be protected. [¶] (2) Water quality objectives. [¶] (3) A program of implementation needed for achieving water quality objectives." (§ 13050, subd. (j).)

The record contains findings Regional Board considered the foregoing factors when adopting the 1975 basin plans for the Santa Clarita and Los Angeles Rivers and their tributaries. When Regional Board amended the basin plans in 1994 by combining them into one plan, a staff report expressly noted "most of the water quality objectives are not being changed . . . ." (Underscoring omitted.) That report also discussed the potential economic impacts from some of the objectives that were revised. In addition, Regional Board considered section 13241's factors when it adopted the 2001 MS4 permit and the 2002 bacteria objectives.

■ Generally, "[i]t is presumed that official duty has been regularly performed." (Evid. Code, § 664; see *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 976 [3 Cal.Rptr.2d 643] ["the relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the board] *failed* to comply with the requirements of its . . . regulatory program" and, "[i]n the absence of contrary evidence, we presume regular performance of official duty"].) Section 13241 does not specify how a water board must go about considering the specified factors. Nor does it require the board to make specific findings on the factors. Furthermore, the parties appear to concede the 1994 amendment to the basin plan, while it combined the two prior basin plans into one and extended the revised plan to cover storm water and urban runoff, did not change the water quality objectives.

Plaintiffs argue Regional Board failed to consider section 13241's factors in relation to storm water. First, we note the 1994 basin plan, which dealt with storm water, did contain an express reference to section 13241 and the

staff report did discuss the potential for economic impacts from some of the changes made in the plan's water quality objectives.

■ Second, it is clear under both the Clean Water Act and the Porter-Cologne Act that the focus of a basin plan is the water bodies and the beneficial uses of those water bodies, not the potential sources of pollution for those water bodies. The Clean Water Act declares "revised or new water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." (33 U.S.C. § 1313(c)(2)(A); see also 40 C.F.R. §§ 131.3(i) (2010) ["Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." (italics omitted)], 131.2 (2010)) [a "water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses"].) Similarly, the Porter-Cologne Act requires regional boards to "formulate and adopt water quality control plans for all areas within the region." (§ 13240.) Section 13050, subdivision (j) defines a " '[w]ater quality control plan' " as applying to the "[b]eneficial uses to be protected" "for the waters within a specified area." Merely revising a basin plan to include storm water and urban runoff from municipal storm drains discharging into water bodies already covered by that plan did not trigger the need to comply with section 13241.

Plaintiffs' reliance on *City of Burbank v. State Water Resources Control Bd., supra*, 35 Cal.4th 613 lacks merit. There Regional Board issued wastewater discharge permits to wastewater treatment facilities. The permits contained daily numeric limitations for several pollutants. The cities challenged the numeric requirements, alleging Regional Board failed to comply with section 13263, subdivision (a), which required a regional board to "take into consideration . . . the provisions of Section 13241" when prescribing the requirements for a "proposed" or "existing discharge . . . with relation to the conditions existing in the disposal area or receiving waters . . . ."

*City of Burbank* concerned the validity of California's equivalent of an NPDES permit, not a basin plan or a regional board's periodic review of that plan. While the case recognized section 13263 imposed a requirement that waste discharge permits comply with section 13241 (*City of Burbank v. State Water Resources Control Bd., supra*, 35 Cal.4th at p. 625), as discussed above, defendants did comply with section 13241 in issuing the MS4 permits to plaintiffs and in establishing the TMDL's for those permits.

■ Furthermore, as interveners argue *City of Burbank* further held a failure to consider section 13241's factors will invalidate a permit only if

Regional Board imposed water quality requirements exceeding those imposed by federal law. "Because section 13263 cannot authorize what federal law forbids, it cannot authorize a regional board, when issuing a wastewater discharge permit, to use compliance costs to justify pollutant restrictions that do not comply with federal clean water standards. Such a construction of section 13263 would not only be inconsistent with federal law, it would also be inconsistent with the Legislature's declaration in section 13377 that all discharged wastewater must satisfy federal standards." (*City of Burbank v. State Water Resources Control Bd., supra*, 35 Cal.4th at p. 626, fns. omitted.)

■ As applied here, to succeed on their petition plaintiffs needed to show Regional Board had imposed water quality requirements exceeding those established by the Clean Water Act. The federal requirements set a minimum water quality level and, as *City of Burbank* held, a state cannot use state law limitations to impose lower water quality levels. The record reflects Regional Board's actions were compelled by federal law. Absent a showing defendants sought to impose water quality objectives exceeding what federal law required, plaintiffs cannot prevail.

## 5. *Consideration of "Potential" Beneficial Uses*

As noted, section 13241 declares the "[f]actors to be considered by a regional board in establishing water quality objectives shall include, but not necessarily be limited to . . . [¶] . . . [p]ast, present, and probable future beneficial uses of water." (§ 13241, subd. (a).) The record reflects Regional Board's basin plan also took into consideration "potential" beneficial uses of water in setting water quality objectives. The trial court granted plaintiffs' relief as to this action, finding "basing [s]tandards on 'potential' uses is inconsistent with the clear and specific requirement . . . that [b]oards consider 'probable future' uses."

This portion of the judgment is also erroneous. " '[W]hile interpretation of a statute or regulation is ultimately a question of law, we must also defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise, unless the interpretation flies in the face of the clear language and purpose of the interpreted provision.' [Citation.]" (*Divers' Environmental Conservation Organization v. State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246, 252 [51 Cal.Rptr.3d 497].)

■ Contrary to the trial court's construction, "[t]he phrase 'including, but not limited to' is a term of enlargement, and signals the Legislature's intent that [a statutory provision] appl[y] to items not specifically listed in the

provision. [Citation.]" (*Major v. Silna* (2005) 134 Cal.App.4th 1485, 1495 [36 Cal.Rptr.3d 875].) Given the expansive scope of the Legislature's findings contained in section 13000, plus the findings in the 2001 MS4 permit citing water quality objectives for discharges to the state's coastal waters, allowing a regional board to interpret its authority under section 13241 to include the development of water quality objectives based on potential, as opposed to probable, beneficial uses would be appropriate. Therefore, the trial court erred in limiting Regional Board's exercise of its discretion in developing water quality objectives.

### 6. *Pending Motions*

Interveners have filed two requests for judicial notice. One seeks to place before the court a February 2009 proclamation by the Governor concerning the current drought conditions in the state, plus a portion of a 1994 EPA handbook on water quality. The second motion asks the court to take judicial notice of an October 2009 letter from an EPA regional director expressing the federal agency's concerns about the trial court's decision in this case. Defendants have also requested judicial notice of the October 2009 letter. While these documents appear to qualify for judicial notice, none appear relevant to the issues presented in these appeals. These requests are denied.

Amici curiae County of Los Angeles and Los Angeles County Flood Control District have also filed a request for judicial notice of three documents. One is a copy of excerpts of the current MS4 permit. The other two documents are 2004 and 2005 Regional Board staff reports on the costs involved in implementing the TMDL's. Again, none of the documents appear relevant to the issues on appeal and the request is denied.

In addition, interveners have moved to strike part IV.H. of plaintiffs' reply brief on the ground it constitutes an improper surreply brief. If so, this court may simply disregard the offending contentions. We deny this motion as well.

### DISPOSITION

The judgment is reversed and the matter remanded to the superior court with directions to vacate the writ and enter a new judgment denying the petition. The appeal filed by plaintiffs is dismissed as moot. The requests for judicial notice and motion to strike portions of plaintiffs' and appellants' reply brief are denied. Appellants State Water Resources Control Board,

California Regional Water Quality Control Board, Los Angeles Region, Natural Resources Defense Council, Santa Monica Baykeeper, and Heal the Bay shall recover their costs on appeal.

Aronson, J., and Ikola, J., concurred.

A petition for a rehearing was denied January 20, 2011, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied March 16, 2011, S190219.