[No. A127207. First Dist., Div. Four. Aug. 30, 2012.]

CALIFORNIA ASSOCIATION OF SANITATION AGENCIES et al.,
Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Respondents.

1440

**COUNSEL**

Archer Norris, Peter W. McGaw, John L. Kortum; Downey Brand and Melissa A. Thorme for Plaintiff and Appellant California Association of Sanitation Agencies.

Somach Simmons & Dunn, Paul S. Simmons, Theresa A. Dunham; Gerald Hobrecht, City Attorney, and Shana Faber, Assistant City Attorney, for Plaintiff and Appellant City of Vacaville.

Kari Elizabeth Fisher for California Farm Bureau Federation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Robert W. Byrne, County Counsel, and Michael Neville, Deputy County Counsel, for Defendant and Respondent State Water Resources Control Board.

**OPINION**

**RIVERA, J.**—Plaintiffs California Association of Sanitation Agencies (CASA) and the City of Vacaville (Vacaville) (collectively, the Municipalities)[1] appeal a judgment entered after the trial court denied their petitions for writ of mandate challenging actions of the California Regional Water Quality Control Board for the Central Valley Region (Regional Board) and the State Water Resources Control Board (State Board) (collectively, the Boards). They contend beneficial use designations in the Water Quality Control Plan for the

---

[1] CASA alleges it is a "statewide association of publicly-owned treatment works . . . representing the common legislative, regulatory and legal interest of its 115 member agencies," of which Vacaville is a member.

Sacramento and San Joaquin River Basins (the Basin Plan) are unlawful, and that the Basin Plan unlawfully incorporates by reference standards and criteria adopted by other agencies. We shall affirm the judgment without prejudice to any right Vacaville may have to seek further Basin Plan amendments or initiate legal proceedings.[2]

## I. BACKGROUND

In order to provide a legal context for the history of this case, we summarize the statutory and regulatory scheme governing water quality.

"In 1972, Congress enacted amendments (Pub.L. No. 92-500 (Oct. 18, 1972) 86 Stat. 816) to the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), which, as amended in 1977, is commonly known as the Clean Water Act. . . . [T]he act established 'effluent limitations,' which are restrictions on the 'quantities, rates, and concentrations of chemical, physical, biological, and other constituents'; these effluent limitations allow the discharge of pollutants only when the water has been satisfactorily treated to conform with federal water quality standards. (33 U.S.C. §§ 1311, 1362(11).) [¶] Under the federal Clean Water Act, each state is free to enforce its own water quality laws so long as its effluent limitations are not 'less stringent' than those set out in the Clean Water Act. (33 U.S.C. § 1370.)" (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619–620 [26 Cal.Rptr.3d 304, 108 P.3d 862] (*City of Burbank*).)

The "Clean Water Act" (Federal Water Pollution Control Act; 33 U.S.C. § 1251 et seq.) required the states to adopt and submit to the Environmental Protection Agency (EPA) water quality standards for intrastate waters by April 1973. (33 U.S.C. § 1313(a)(2) & (3).) Those standards were to consist of the designated uses of the navigable waters involved and the water quality criteria for the waters based on those uses. (33 U.S.C. § 1313(c)(2)(A).)

"Part of the federal Clean Water Act is the National Pollutant Discharge Elimination System (NPDES), '[t]he primary means' for enforcing effluent limitations and standards under the Clean Water Act. [Citation.] The NPDES sets out the conditions under which the federal EPA or a state with an approved water quality control program can issue permits for the discharge of

---

[2] Our review of this case was made more difficult by the many assertions of fact in the briefs on appeal, particularly the Boards' respondents' brief, that were unsupported by citations to the record, or that referred to large blocks of pages. This problem persisted even after we directed the Boards to submit a corrected respondents' brief with proper citations to the appellate record. We remind the parties of their duty to provide adequate record citations. (Cal. Rules of Court, rule 8.204(a)(1)(C); see *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205 [277 Cal.Rptr. 401].)

pollutants in wastewater. (33 U.S.C. § 1342(a) & (b).)" (*City of Burbank, supra*, 35 Cal.4th at p. 621.)

■ "In California, the controlling law is the Porter-Cologne Water Quality Control Act (Porter-Cologne Act), which was enacted in 1969. (Wat. Code,[3] § 13000 et seq., added by Stats. 1969, ch. 482, § 18, p. 1051.) Its goal is 'to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible.' (§ 13000.) The task of accomplishing this belongs to the [State Board] and the nine Regional Water Quality Control Boards . . . . [¶] Whereas the State Board establishes statewide policy for water quality control (§ 13140), the regional boards 'formulate and adopt water quality control plans for all areas within [a] region' (§ 13240). The regional boards' water quality plans, called 'basin plans,' must address the beneficial uses to be protected as well as water quality objectives, and they must establish a program of implementation.[4] (§ 13050, subd. (j).) Basin plans must be consistent with 'state policy for water quality control.' (§ 13240.)" (*City of Burbank, supra*, 35 Cal.4th at p. 619, fn. omitted.)

Shortly after the Clean Water Act was adopted, the Porter-Cologne Act was amended to add the necessary requirements so that California could obtain EPA approval to issue NPDES (National Pollutant Discharge Elimination System) permits. (§ 13370, subd. (c); *Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 875 [22 Cal.Rptr.3d 128] (*Building Industry Assn.*).) Accordingly, "the waste discharge requirements issued by the regional water boards ordinarily also serve as NPDES permits under federal law. (Wat. Code, § 13374.)" (*Building Industry Assn.*, 124 Cal.App.4th at p. 875.)

■ " '[T]he proper scope of the controls in an NPDES permit depends on the applicable state water quality standards for the affected water bodies. [Citation.]' [Citation.] 'Under the . . . NPDES permit system, the states are required to develop *water quality standards*. [Citations.] A water quality standard "establish[es] the desired condition of a waterway." [Citation.] A water quality standard for any given waterway, or "water body," has two components: (1) the designated beneficial uses of the water body and (2) the

---

[3] All further undesignated code sections refer to the Water Code.

[4] Under the Porter-Cologne Water Quality Control Act (Porter-Cologne Act; Wat. Code, § 13000 et seq.), "water quality objectives" are "the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area" (§ 13050, subd. (h)) and "beneficial uses" are "uses" "that may be protected against quality degradation [which] include, but are not limited to, domestic, municipal, agricultural and industrial supply . . . recreation . . . and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves." (§ 13050, subd. (f).)

*water quality criteria* sufficient to protect those uses. [Citations.]' [Citations.]" (*City of Arcadia v. State Water Resources Control Bd.* (2010) 191 Cal.App.4th 156, 163 [119 Cal.Rptr.3d 232] (*City of Arcadia*).) In prescribing waste discharge requirements and in establishing water quality objectives, the regional boards are required to consider a number of factors, including "[p]ast, present, and probable future beneficial uses of water" and "[e]conomic considerations" (§ 13241, subds. (a) & (d); see § 13263, subd. (a)).[5]

## II. FACTS AND PROCEDURAL HISTORY

### A. The Basin Plan

At issue are three aspects of the Basin Plan: The "tributary language," the incorporation of State Board resolution No. 88-63 setting forth the " 'Sources of Drinking Water' " policy, and the plan's "water quality objectives." We discuss each in turn.

### 1. The Tributary Language

The Regional Board initially adopted its Basin Plan in 1975. The Basin Plan defined various "beneficial uses" of surface waters and groundwater. Among those beneficial uses were "Municipal and Domestic Supply" (MUN), which included "usual uses in community or military water systems and domestic uses from individual water supply systems"; and "Cold Freshwater Habitat" (COLD), which "provides a coldwater habitat to sustain aquatic resources associated with a coldwater environment." The 1975 Basin Plan included a table designating beneficial uses for a number of surface water bodies (a later version of which was known as "Table II-1"), and included a footnote stating, "[t]hose streams not listed have the same beneficial uses as the streams, lakes, or reservoirs to which they are tributary." This footnote is referred to as the "tributary rule" or the "tributary footnote." COLD and MUN were designated as beneficial uses of the delta. No designations were specified for Old Alamo Creek and New Alamo Creek, which are tributaries to the delta and two of the water bodies at issue here.

A 1994 Regional Board staff report recommended a modification of the tributary language. The report stated that when the Basin Plan was first adopted, the beneficial use designations were incomplete, listing only 96 of the region's estimated 10,000 waters. According to the report, "The Regional Water Board envisioned that, in the ensuing years, there would be a continuing planning process in which tributaries of the major water bodies would be investigated in some priority fashion, and the beneficial uses of these

---

[5] The application of the guiding considerations contained in section 13241, however, cannot be used to override federally mandated effluent limitations. (*City of Burbank, supra,* 35 Cal.4th at p. 626 [regional board cannot use "economic hardship" to justify less stringent effluent standards than those required under the Clean Water Act]; see § 13377.)

tributaries would be identified and designated in periodic amendments to the Basin Plan. In the interim, the Regional Water Board knew it would need to make decisions involving waters not named in [the Basin Plan] and for which little detailed information was available. The tributary footnote was thus conceived to bridge the information gap and provide guidance until factual information was available." As of 1994, however, the Basin Plan's beneficial use designations had not yet been completed. The report continued, "The tributary footnote, intended as a temporary palliative for the lack of beneficial use information when formulating tentative waste discharge requirements and enforcement documents, is being misunderstood and misused by various parties. The Regional Water Board never intended that the footnote serve as the foundation for establishing water quality objectives. And, the Regional Water Board certainly never intended that the footnote should prevail over findings of scientific fact . . . ."

The report proposed deleting the tributary footnote and adding new "clarifying language" to the 1995 Basin Plan, describing the proposed language as an attempt "to more explicitly describe how the Regional Water Board applies beneficial uses, in the absence of scientific fact, to waters tributary to the water bodies listed in [the Basin Plan]. . . . This alternative would eliminate much of the confusion caused by the wording of the tributary footnote, without changing its intended meaning." The report continued, "The proposed language eliminates present and future problems of misinterpretation and misuse, and removes a known falsehood from the Basin Plan. This approach allows for collection of information to better determine what beneficial uses need to be protected. It avoids the problems created by applying inaccurate beneficial uses to some water bodies. The proposed language clarifies how the Regional Water Board already interprets the tributary statement in the existing Basin Plan."

In the 1995 Basin Plan, the tributary footnote was deleted and the clarifying language proposed in the 1994 Regional Board staff report was added.[6] The pertinent portion of the 1995 Plan read: "Existing and potential beneficial uses which currently apply to surface waters of the basins are presented in Figure II-1 and Table II-1. The beneficial uses of any specifically identified water body generally apply to its tributary streams. In some cases a beneficial use may not be applicable to the entire body of water. In these cases the Regional Water Board's judgment will be applied. [¶] It should be

---

[6] The parties cite to a copy of the 1998 Basin Plan in the record on appeal. The 1998 Basin Plan appears to have amended the 1995 plan in ways not relevant here. The parties do not dispute that the language at issue here was contained in the 1995 Basin Plan. For the sake of clarity, we will refer to the relevant plan as the 1995 Plan.

noted that it is impractical to list every surface water body in the Region. For unidentified water bodies, the beneficial uses will be evaluated on a case-by-case basis."

In 2000, the EPA disapproved certain aspects of the 1995 Plan; these aspects included the deletion of the tributary footnote and the addition of the new language providing that the beneficial uses of specifically identified water bodies generally applied to its tributary streams and that where a beneficial use was not applicable to an entire body of water, the Regional Board's judgment would be applied. The EPA reasoned that the amended language gave the impression that the uses applicable to any given tributary could be designated or modified "on a case-by-case basis simply by an exercise of judgment by the Regional Board, and may vary depending upon the situation at hand." The deleted tributary footnote, on the other hand, according to the EPA, "in effect, established uses for all tributary streams not identified by name in Table II-1. The Regional Board has not demonstrated that any of those uses that were so designated as existing uses are not, in fact, existing uses (as defined in 40 CFR 131.3(e)), nor has the Regional Board demonstrated (as required by 40 CFR 131.10(g) for the removal of designated uses that are not existing uses) that any of the uses that were so designated as potential uses are not attainable (as defined by 40 CFR 131.10(d)) in any of the waters covered by the tributary rule footnote. If the Regional Board wishes to remove any of the uses designated by means of the tributary rule from any waters covered by that rule, it must do so by means of a public process that fully complies with the requirements of 40 CFR 131.10. Upon completion of such a process, such waters and their amended designated uses must be identified in the Basin Plan."[7]

Despite the EPA's action, the parties agree that under federal regulations, the disapproved 1995 Plan revision remains in effect unless or until the EPA promulgates a more stringent water quality standard, and that the EPA has not done so. (40 C.F.R. § 131.21(c) (2012).)

2. *Resolution No. 88-63*

In 1988, in order to implement Proposition 65, the State Board adopted resolution No. 88-63, the "Sources of Drinking Water" policy. The policy provided that "All surface and ground waters of the State are considered to be

---

[7] 40 Code of Federal Regulations part 131.10 (2012) requires each state to designate water uses to be achieved and protected, taking into account the water quality standards of downstream waters (40 C.F.R. § 131.10(a) & (b) (2012)), and provides that "[p]rior to adding or removing any use, or establishing sub-categories of a use, the State shall provide notice and an opportunity for a public hearing under § 131.20(b) of this regulation." (40 C.F.R. § 131.10(e).)

suitable, or potentially suitable, for municipal or domestic water supply and should be so designated by the Regional Boards [with certain exceptions]." (Fn. omitted.) Among those exceptions were surface waters where "a. The water is in systems designed or modified to collect or treat municipal or industrial wastewaters, process waters, mining wastewaters, or storm water runoff . . . ; or, [¶] b. The water is in systems designed or modified for the primary purpose of conveying or holding agricultural drainage waters . . . ."

The Regional Board incorporated resolution No. 88-63 into the Basin Plan by adding the following provision: "Water Bodies within the basins that do not have beneficial uses designated in Table II-1 are assigned MUN designations in accordance with the provisions of State Water Board Resolution No. 88-63 which is, by reference, a part of this Basin Plan. These MUN designations in no way affect the presence or absence of other beneficial use designations in these water bodies. [¶] In making any exemptions to the beneficial use designation of MUN, the Regional Board will apply the exceptions listed in Resolution 88-63 . . . ."[8]

In 1989, the Office of Administrative Law (OAL) issued determination No. 8, deciding that the provisions of resolution No. 88-63 were " 'regulations' as defined in Government Code section 11342, subdivision (b)" (former § 11342, subd. (b), repealed by Stats. 2000, ch. 1059, § 6.2, p. 8057, ch. 1060, § 7, 8082) and therefore were subject to the requirements of California's Administrative Procedure Act (Gov. Code, § 11340 et seq.) (APA), that they were not adopted pursuant to the APA's requirements, and that they therefore violated Government Code former section 11347.5, subdivision (a) (now Gov. Code, § 11340.5). The Legislature subsequently amended the Government Code to provide a different process for OAL review of any plans, policies, guidelines or revisions adopted pursuant to the Porter-Cologne Act after June 1, 1992, and exempting them from the rulemaking provisions of the APA. (Gov. Code, §§ 11352–11354.) These provisions also grandfathered in the plans, policies and guidelines adopted prior to June 1992, except for any that were the subject of a civil action as of the effective date of the new statutes. (Gov. Code, § 11353, subd. (c).) Thereafter, OAL approved the 1995 Plan which again incorporated resolution No. 88-63.

*Water Quality Objectives*

The 1995 Plan includes a number of water quality objectives, two of which are at issue here.[9] The "Chemical Constituents" objective for inland surface waters provides in part: "Waters shall not contain chemical constituents in

---

[8] The parties agree that the Regional Board first incorporated resolution No. 88-63 into the Basin Plan in 1989.

[9] As noted earlier, " '[w]ater quality objectives' means the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area." (§ 13050, subd. (h).)

concentrations that adversely affect beneficial uses. . . . [¶] At a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449. This incorporation-by-reference is prospective, including future changes to the incorporated provisions as the changes take effect." The "Pesticides" objective provides in part: "No individual pesticide or combination of pesticides shall be present in concentrations that adversely affect beneficial uses. [¶] . . . Discharges shall not result in pesticide concentrations in bottom sediments or aquatic life that adversely affect beneficial uses. [¶] . . . Total identifiable persistent chlorinated hydrocarbon pesticides shall not be present in the water column at concentrations detectable within the accuracy of analytical methods approved by the Environmental Protection Agency or the Executive Officer."

### B. *The Treatment Plant*

Vacaville operates the Easterly Wastewater Treatment Plant (the treatment plant), which discharges effluent to Old Alamo Creek. Old Alamo Creek flows into New Alamo Creek, then into Ulatis Creek and Cache Slough. New Alamo Creek's confluence with Ulatis Creek forms the boundary of the Sacramento-San Joaquin River Delta, and Cache Slough is likewise within the delta. There is evidence that the flows in Old Alamo Creek upstream from the treatment plant consist of storm water runoff during the wet season, agricultural tailwater during the dry season, and discharges from a groundwater remediation project. It is not used directly as a drinking water supply, and indeed, the water quality in the creek does not meet the standards for a municipal water supply and such quality is likely not attainable for the foreseeable future.

Old Alamo Creek is an "effluent-dominated stream," meaning that "stream flow during all or part of the year can be dominated by treated [sewage] effluent." The effluent from the treatment plant is diluted as it moves toward the delta; the dilution ratios can exceed 100 to one in the downstream portions of Cache Slough.

### C. *The 2001 Permit and Review by the State Board*

Vacaville operated the treatment plant pursuant to discharge permits issued by the Regional Board. The permit issued in 2001 imposed more stringent

requirements than had the previous permits.[10] In order No. 5-01-044, the Regional Board concluded that, although Old Alamo Creek was four and a half miles from the legal boundary of the delta, "due to the ephemeral nature of Old Alamo Creek[,] . . . the beneficial uses identified in the Basin Plan for the Delta must be protected at the end of pipe discharge into Old Alamo Creek . . . ."[11] Those beneficial uses included the MUN and COLD designations. Moreover, the Regional Board concluded, Cache Slough was part of the delta, and had the designated beneficial use of MUN as an existing use.[12] The Regional Board continued, apparently referring to Cache Slough and the delta: "In addition, these waters meet the definition of sources of drinking water as defined in State Water Resources Control Board Resolution No. 88-63, adopted by the Board on 30 June 1988, and the Basin Plan identifies these downstream waters as having existing municipal or domestic uses downstream of the discharge point." The permit set limits for discharges based on the delta's use designations, including MUN and COLD, and applied a "non-detectable limitation" to at least one pesticide.

Vacaville petitioned the State Board for review of the 2001 permit, and the State Board held an evidentiary hearing and reviewed the permit. (§ 13320; Cal. Code Regs., tit. 23, § 2064.) In order WQO 2002-0015, the State Board concluded the Regional Board reasonably interpreted the 1995 Plan language as assigning beneficial uses to tributary streams, and in particular, as assigning MUN, COLD, AGR, and REC-1 uses to Old Alamo Creek. The State Board ruled the Regional Board had properly concluded that MUN was previously designated for Old Alamo Creek through the tributary footnote, and that a Basin Plan amendment was the proper way to change the creek's uses. Recognizing, however, that COLD and MUN were likely inappropriate uses for Old Alamo Creek, the State Board directed the Regional Board to

---

[10] As the State Board later explained, "[f]or the first time, the Central Valley Regional Board applied the Delta's beneficial uses to Old Alamo Creek in Vacaville's [2001] permit. The assigned uses include drinking water supply (MUN), body contact recreation (REC-1), cold water aquatic habitat (COLD), and agricultural supply (AGR). Based on the assigned MUN use, the Central Valley Regional Board included human health-based effluent limits for nitrate and for CTR pollutants, including trihalomethanes. To protect the assigned REC-1 and AGR uses, the Central Valley Regional Board imposed permit limits based on tertiary treatment. The permit also prohibits Vacaville from blending primary and secondary effluent during wet weather events, a practice that was allowed in prior permits." Vacaville's 1990 permit, for example, had recited that the beneficial uses of Alamo Creek were "generally limited to agricultural supply, but the creek is accessible to the public and the entire flow, at times, may be effluent."

[11] According to the State Board, dischargers into dry or ephemeral streams, unlike dischargers into flowing streams, are not allowed dilution credits for their effluent, but must meet water quality standards "at the end of the pipe" that discharges the effluent.

[12] It appears that the City of Vallejo has an emergency drinking water intake in Cache Slough, which was used until 1992.

initiate "expeditiously" amendments to the Basin Plan to consider dedesignating those uses.[13] The State Board also concluded that certain discharge limitations were not rendered "invalid because they are based on objectives that prospectively incorporate-by-reference."

## D. *Trial Court Proceedings*

Vacaville and CASA filed separate petitions for writ of mandate challenging the Boards' actions, and the cases were consolidated.

Before the trial court ruled on the petitions for writ of mandate, the Basin Plan was amended to provide that MUN and COLD uses did not apply to Old Alamo Creek from its headwaters to the confluence with New Alamo Creek.[14] Moreover, during the pendency of the litigation, the 2001 permit expired. The trial court dismissed one cause of action as moot, but ruled on four causes of action, concluding the issues were of broad public interest, in that parties in future administrative proceedings would be able to cite order WQO 2002-0015 as a precedential decision, and that a recurrence of the controversy was probable.[15] Those four causes of action, relating to the designation of beneficial uses and incorporation by reference of water quality objectives, are the subject of this appeal.

---

[13] As pertinent here, the State Board concluded: "1. The Central Valley Regional Board properly implemented the tributary stream provisions in the [c]urrent Basin Plan. [¶] 2. The Central Valley Regional Board reasonably determined that a basin plan amendment was the appropriate vehicle to designate or dedesignate uses for Old Alamo Creek. [¶] 3. Neither COLD nor MUN is an existing use for Old Alamo Creek, and it is unlikely that they can feasibly be attained. [¶] . . . [¶] 6. The Central Valley Regional Board must expeditiously initiate basin plan amendments to consider dedesignating COLD and MUN from Old Alamo Creek, and may require that Vacaville provide assistance, such as data collection and water quality-related investigations, in this effort. [¶] 7. Where a Regional Board has evidence that a use does not exist and likely is not feasibly attainable, the Regional Board should avoid enforcing permit limits to protect the use at least until the Regional Board either amends the basin plan to dedesignate the use, or determines that the use cannot legally be dedesignated. [¶] 8. In the circumstances described in 7., the Regional Board can provide interim permit relief, pending appropriate basin plan amendments, through compliance schedules in the permit, where authorized; case-by-case exceptions for priority pollutants under the Toxics Policy; and, as a last resort, compliance schedules in an enforcement order . . . . [¶] . . . [¶] 10. The Sources of Drinking Water Policy and the basin plan amendment implementing the policy are exempt from the APA's rulemaking requirements. [¶] 11. The Central Valley Regional Board designated Old Alamo Creek for MUN as an implementation of the Sources of Drinking Water Policy. [¶] 12. If the Central Valley Regional Board amends its [c]urrent Basin Plan to dedesignate MUN for Old Alamo Creek, the State Board will consider amending Resolution No. 88-63, concurrently with Board action on the basin plan amendment, to exempt Old Alamo Creek."

[14] New Alamo Creek continued to be assigned MUN and COLD beneficial uses.

[15] The remaining causes of action were later dismissed.

Specifically, in the causes of action upon which the trial court ruled, the petitioners alleged that the Boards improperly applied the tributary language of the 1995 Plan in determining and reviewing beneficial uses and permit requirements; that the Boards improperly applied resolution No. 88-63 in concluding Old Alamo Creek had a MUN use; that the Basin Plan violated the Water Code in incorporating effluent limitations by reference; and that there was no evidence to support the designation of COLD and MUN uses in Old Alamo Creek and New Alamo Creek. In those causes of action, the Municipalities sought a peremptory writ of mandate that, among other things, (1) directed the State Board to rescind order WQO 2002-0015 to the extent it concluded the Basin Plan designated beneficial uses not identified in Table II-1 of the Basin Plan; (2) directed the State Board to rescind order WQO 2002-0015 to the extent it concluded that resolution No. 88-63 and the Basin Plan designate the MUN use for Old Alamo Creek, New Alamo Creek, Ulatis Creek, or Cache Slough, or, in the alternative, to recognize that the exceptions to resolution No. 88-63 applied to Old Alamo Creek and New Alamo Creek; (3) directed the Boards to amend the Basin Plan to exclude water quality objectives based on incorporation by reference; and (4) directed the Regional Board to rescind its orders adopting or amending the Basin Plan insofar as they designated COLD and MUN uses for Old Alamo Creek and New Alamo Creek and to remove those designations.

On cross-motions for summary judgment, the trial court ruled in favor of the Boards. The trial court denied declaratory relief or mandate on the validity of the Basin Plan, concluding that an adequate procedure existed, through the amendment process, for the Municipalities to challenge the designation of the beneficial uses of waters that were tributary to the delta. The court also rejected the Municipalities' contention that the Basin Plan wrongfully incorporated external maximum contaminate levels and pesticide limitations, concluding in part that the Legislature had delegated to the State Department of Public Health the determination of when water is safe to drink. The court concluded that the requirement that certain pesticides not be detectible within the accuracy of analytical methods approved by the EPA or the Regional Board's executive officer constituted not a delegation, but a source of scientific information.

On appeal, the Municipalities ask us to issue a writ of mandate directing the Boards to: "1. Rescind or cease rote application of downstream Beneficial Uses to upstream tributaries under the 1975 Tributary Footnote or 1994 Tributary Statement; [¶] 2. Rescind and cease application of a blanket MUN Beneficial Use to undesignated waterbodies pursuant to the invalidated Resolution 88-63; [¶] 3. Rescind the Chemical Constituents Objective and Pesticide Objective; and [¶] 4. Vacate the Boards' adjudicatory orders, including SWRCB Order No. WQ 2002-0015, to the extent such orders conflict with the rulings of this Court."

## III. DISCUSSION

A. *Standard of Review*

" 'Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.' [Citation.]" (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 [52 Cal.Rptr.2d 466] (*McGill*).)

The decision to grant or deny a permit is a quasi-judicial function, and a petition for writ of mandate challenging such a decision is governed by the standards of Code of Civil Procedure section 1094.5. (*City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1384–1385 [38 Cal.Rptr.3d 450] (*City of Rancho Cucamonga*); § 13330, subd. (d).) Under that statute, the trial court inquires into whether the agency "proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) The trial court exercises its independent judgment, affording " 'a strong presumption of correctness concerning the administrative findings . . . .' [Citation.] [¶] On appeal, the reviewing court determines whether substantial evidence supports the trial court's factual determinations. [Citations.] The trial court's legal determinations receive a de novo review with consideration being given to the agency's interpretations of its own statutes and regulations. [Citations.]" (*City of Rancho Cucamonga, supra*, 135 Cal.App.4th at p. 1384; see *County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985, 997 [50 Cal.Rptr.3d 619] [we defer to regional board's expertise in construing language not clearly defined in statutes].)

In reviewing an agency's quasi-legislative action, in contrast, " '[a] reviewing court will ask three questions: first, did the agency act within the scope of its delegated authority; second, did the agency employ fair procedures; and third, was the agency action reasonable. Under the third inquiry, a reviewing court will not substitute its independent policy judgment for that of the agency on the basis of an independent trial de novo. A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' [Citation.] Moreover, absent any indication of arbitrariness or evidentiary or procedural defect, ' ". . . in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and

officers work out their problems with as little judicial interference as possible." ' [Citation.]" *(United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 112–113 [227 Cal.Rptr. 161].) As explained in *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 231–232 [1 Cal.Rptr.2d 818] *(Shapell),* the standard of review of quasi-legislative actions is not synonymous with substantial evidence review. Rather, "[t]he appropriate degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a contiuum with nonreviewability at one end and independent judgment at the other. [Citation] Since the ultimate question is whether the agency has abused its discretion, the answer is one of degree. In each case the court must satisfy itself that the order was supported by the evidence, although what constitutes reasonable evidentiary support may vary depending upon the nature of the action. [Citations.] A proceeding which has determined individual rights in a factual context will warrant more exacting judicial review of the evidence. Otherwise courts will tend to defer to the presumed expertise of the agency acting within its scope of authority. Our case lies towards that end of the continuum, where the focus is on the reasonableness of the agency's action as a whole." *(Id.* at p. 232.)

In an action for ordinary mandamus, the trial court and the appellate court perform the same function, and we review the matter without reference to the trial court's actions. *(McGill, supra,* 44 Cal.App.4th at p. 1786; Code Civ. Proc., § 1085.)

B. *Statute of Limitations*

In a footnote, the Boards appear to suggest that the Municipalities' claims may be barred by the statute of limitations. We may disregard this contention, because it is not raised in a properly headed argument and is not supported by reasoned argument. *(Roberts v. Lomanto* (2003) 112 Cal.App.4th 1553, 1562 [5 Cal.Rptr.3d 866]; *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 160 [35 Cal.Rptr.3d 745]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273]; Cal. Rules of Court, rule 8.204(a)(1)(B).)

■ In any case, as explained in *City of Arcadia, supra,* 191 Cal.App.4th at pages 170–172, the statute of limitations for a facial challenge to a water quality control plan is three years (Code Civ. Proc., § 338). However, the court indicated that the "continuing violation exception" may apply where a party raises a facial challenge to an enactment within the limitations period from the time a permit was issued pursuant to the enactment. *(City of Arcadia, supra,* 191 Cal.App.4th at pp. 171–172, citing *Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 768–769 [16 Cal.Rptr.3d 404, 94 P.3d 538] [facial challenge to 20-year-old county ordinance timely when filed within 90 days of issuance of permit imposing restrictions] and *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 821–822 [107 Cal.Rptr.2d

369, 23 P.3d 601].) Here, the petitions were filed within three years of the issuance of the 2001 permit, and challenge restrictions that were imposed for the first time in that permit. Accordingly, the action is not time-barred.

C. *Beneficial Use Designations*

The Municipalities challenge the MUN and COLD beneficial use designations of waters that are tributary to the delta, contending that to the extent the Basin Plan establishes "blanket" designations, they are unlawful, and that we should instead construe the Basin Plan to allow case-by-case designation of the uses of unnamed tributary waters as part of the permitting process. We must decide whether the Municipalities are correct, or whether, as the Boards argue, beneficial uses of tributaries were properly established by the tributary language in the Basin Plan and may be modified only through a quasi-legislative proceeding to amend the Basin Plan.[16]

1. *The State Board's Reasoning*

In order WQO 2002-0015, the State Board explained its reasoning in detail, and it is worthwhile to quote it: "Arguably, the 1994 tributary language [(i.e., the tributary language included in the 1995 Plan)] can be read to allow the Central Valley Regional Board to determine beneficial uses in a permit. Nevertheless, the Board concludes that the Central Valley Regional Board's interpretation of the Current Basin Plan is reasonable for several reasons. First, the Central Valley Regional Board's interpretation gives effect to the language. The 1994 tributary language states that the Central Valley Regional Board will exercise its judgment in evaluating whether, presumably, all or some subset of the downstream water's beneficial uses applies to a tributary stream. The language does not actually specify the process that the Central Valley Regional Board will use to assign the uses, i.e., in a permit or through a basin plan amendment. As the language required, the Central Valley Regional Board evaluated Old Alamo Creek's uses on a case-by-case basis for the Vacaville permit. The Central Valley Regional Board included specific findings on the uses and based[]permit provisions accordingly. In particular, the permit included compliance schedules allowing the discharger time to provide information supporting basin plan amendments for uses that appeared to be inappropriate. Under the prior tributary footnote, on the other hand, a downstream water's uses automatically applied to its tributaries. The footnote did not require a case-by-case analysis.

"Secondly, the Central Valley Regional Board's interpretation is consistent with EPA's water quality standards regulations. The water quality standards

---

[16] Amicus curiae *California Farm Bureau Federation* has submitted a brief arguing that the beneficial use designations and use of the tributary language were improper and violated the rules of administrative law. The Boards have filed a brief in reply to the amicus curiae brief. We have considered the arguments made in these briefs.

regulations require a public process with significant public involvement to designate or dedesignate uses. The regulations impose substantive requirements for use designation and dedesignation. The regulations establish a rebuttable presumption that fishable/swimmable uses, such as COLD and REC-1, are attained and require a UAA [(use attainability analysis; see 40 C.F.R. § 131.3(g) (2012))] to not designate, or to designate a subcategory of, these uses. Permit actions are quasi-adjudicatory and typically do not fulfill either the public participation or the substantive requirements specified in the water quality standards regulations for use designations and dedesignations. Basin planning, on the other hand, is a quasi-legislative process that is well-suited for water quality standards development.

"The Central Valley Regional Board's interpretation is also consistent with state law. Under state law, a basin plan amendment is the appropriate vehicle to designate and dedesignate uses. Beneficial uses are a required component of basin plans. Basin plan amendments are quasi-legislative and subject to review by the [OAL]. The designation and dedesignation of uses can potentially affect a broad sector of the community, including, at a minimum, all direct and indirect dischargers to the waterbody, all waterbody users, and resource agencies. A decision on a waterbody's uses applies to the waterbody as a whole, rather than to a specific permittee. Beneficial use decisions are, thus, more appropriately made in a basin planning, rather than a permit, action.

"Making use determinations on a case-by-case basis in permits is fraught with problems. The state already has a permit backlog. Expanding permit actions to include use designations and dedesignations will only further exacerbate the backlog. In addition, this practice will invite EPA objections to individual permits and will further delay the permitting process. While basin plan amendments may be burdensome and time-consuming, designating and dedesignating beneficial uses in permits is potentially more so. Accordingly, the Board concludes that the Central Valley Regional Board's decision to consider use changes through the basin planning process was reasonable." (Fns. omitted.)

Having concluded that the Regional Board's interpretation of the tributary language was reasonable, the State Board went on to state that the Regional Board, nonetheless, had not gone "far enough." "While basin plan provisions assigning a downstream water's uses to its upstream tributaries are valid as a general rule, their application in particular cases can lead to unreasonable results. . . . At a minimum, where a Regional Board has evidence that a use neither exists nor likely can be feasibly attained, the Regional Board must expeditiously initiate appropriate basin plan amendments to consider dedesignating the use. [¶] Moreover, the Regional Board can require dischargers to the affected waterbody to provide assistance, through data collection, water quality-related investigations, or other appropriate means, to support and expedite the basin plan amendment process [(citing §§ 13267, 13383)]." (Fn.

omitted.) The State Board reviewed the evidence and concluded COLD and MUN were likely not appropriate uses for Old Alamo Creek. It therefore directed the Regional Board to initiate appropriate Basin Plan amendments to consider dedesignating those uses.

### 2. Analysis

#### a. The Tributary Rule

The State Board concluded that any change in the beneficial use of a water body requires an amendment to the Basin Plan, and we find its reasoning persuasive. As we have explained, the Clean Water Act required states to adopt water quality standards, which included designated uses (the equivalent of the Porter-Cologne Act's beneficial uses) by early 1973. (33 U.S.C. § 1313(a)(2), (3)(A), (c)(2)(A); see § 13050, subd. (f).) The 1975 Basin Plan included beneficial uses for a number of surface waters, and provided in the tributary footnote that the unlisted streams had "the same beneficial uses as the streams, lakes, or reservoirs to which they are tributary." This footnote was later replaced by the tributary language of the 1995 Plan; however, the State Board concluded that the tributary footnote "unequivocally designated uses for unnamed tributary streams in the Delta," and the tributary language of the 1995 Plan "cannot be read to dedesignate the uses that had already been designated by the prior footnote."

The Municipalities argue that the "blanket" designations of tributaries lack evidentiary support and are improper because they encompass many streams that in fact do not have the same beneficial uses as the water bodies to which they are tributaries.[17] White it is literally true that the assignation of beneficial uses by the tributary rule was not based upon individualized factual analyses, it was not unreasonable or " ' " 'entirely lacking in evidentiary support' " ' " (*Shapell, supra*, 1 Cal.App.4th at p. 230) for the Regional Board, as a policy matter, to create a working assumption that "the beneficial uses of any specifically identified water body generally apply to its tributary streams." As the 1995 Basin Plan observed, "it is impractical to list every surface water body in the Region," and, therefore, "in cases [where] a beneficial use may not be applicable to the entire body of water . . . the Regional Water Board's judgment will be applied." Moreover, Terry Oda of the EPA, Region 9, testified that many states, including California, "specifically identify uses for significant water bodies, and the Tributary Rule then establishes water quality for upstream water bodies. This is a sensible approach and ensures that water

---

[17] The only California case we have located which applies the tributary rule, *California Sportfishing Protection Alliance v. State Water Resources Control Bd.* (2008) 160 Cal.App.4th 1625, 1632 [73 Cal.Rptr.3d 560], notes that under the tributary rule, the beneficial uses designated in the Basin Plan for the Cosumnes River, "and hence for Deer Creek," included municipal and domestic supply, as well as other uses. The court there was not called upon to decide the propriety of the tributary rule.

quality downstream water bodies [*sic*] are protected. *It is also practicable in light of the large number of water bodies and tributaries within the state.* [¶] EPA believes that a tributary rule is a useful tool for managing a state water quality program and that the established regulatory process provides a needed flexibility for making adjustments to actual uses. . . . Such adjustments may include change to beneficial uses and water quality criteria, which subsequently could affect water quality in the permit." (Italics added.)

We recognize that a MUN or COLD beneficial use may not be appropriate for at least some of the streams covered by the tributary rule, including Old Alamo Creek. But if the Boards were to rescind their orders adopting or amending the Basin Plan insofar as they designated COLD or MUN uses for tributaries, the vast majority of the region's approximately 10,000 water bodies would lack designated beneficial uses, and the State would be left in violation of its obligation under the Clean Water Act to adopt water quality standards. (33 U.S.C. § 1313(a)(2), (3) & (c).) Until the Regional Board has investigated each individual stream, the tributary rule is a reasonable means of protecting the beneficial uses of the waters of the region. (See, e.g., *PUD No. 1 of Jefferson Cty. v. Washington Dept. of Ecology* (1994) 511 U.S. 700, 717 [128 L.Ed.2d 716, 114 S.Ct. 1900] [". . . Class AA water quality standard applies to . . . all 'unclassified surface waters that are tributaries to Class AA waters.' "].)

In the alternative, the Municipalities argue we should interpret the tributary language of the Basin Plan to mean that the beneficial uses of unnamed tributary streams have never been "formally designated," and that the current tributary language (which provides that the beneficial uses of a named body of water generally apply to its tributary streams and that for unidentified water bodies, the beneficial uses will be evaluated on a case-by-case basis) gives the Boards the discretion to determine beneficial uses of unlisted streams on a case-by-case basis when considering a request for a permit.

The interpretation the Municipalities urge is inconsistent with the legal requirements for designating or dedesignating uses. Indeed, the Municipalities fail to consider that the same rulemaking process they wish to avoid would apply, were we to issue a writ rescinding the beneficial use designations adopted by the tributary rule.

The regulations implementing the Clean Water Act provide: "Prior to adding or removing any use, or establishing sub-categories of a use, the State shall provide notice and an opportunity for a public hearing under [part] 131.20(b) of this regulation." (40 C.F.R. § 131.10(e) (2012).)[18] The procedure

---

[18] Title 40 Code of Federal Regulations part 131.20(b) (2012) provides: *"Public participation.* The State shall hold a public hearing for the purpose of reviewing water quality standards, in accordance with provisions of State law, EPA's water quality management regulation (40

the Municipalities contemplate, in which the Boards would designate uses of tributaries in the informal procedures established for deciding NPDES permits, would not comply with these requirements. (See *City of Rancho Cucamonga, supra*, 135 Cal.App.4th at pp. 1381, 1385; Gov. Code, §§ 11352, subd. (b), 11340 et seq. [issuance of waste discharge permits not subject to requirements of rulemaking procedures].) Nor would it foster the full public participation in the use designation process contemplated by the Clean Water Act, its implementing regulations, and California law. (See, e.g., 40 C.F.R. § 25.5(b) (2012) [notice of hearing to be well publicized, generally 45 days in advance]; 40 C.F.R. § 25.5(e) (2012) [procedures for public participation at public hearing]; Gov. Code, § 11353, subd. (b)(4) [OAL reviews responses to public comments on plan approved by State Board to determine compliance with public participation requirements of Clean Water Act]; cf. Gov. Code, § 11445.40, subd. (b); Cal. Code Regs., tit. 23, § 648.1, subd. (d) [at informal adjudicative hearing presiding officer *may* permit nonparties to offer comments].) We, therefore, cannot conclude the Boards acted unreasonably in requiring a Basin Plan amendment to change the use designations of tributaries.

The Municipalities argue that this interpretation violates their due process rights because "no legal mechanism exists for an interested party to petition a regional board to adopt amendments to existing Basin Plans, or to compel a regional board to act on any amendment. . . . [¶] . . . In short, the remedy that the trial court offers as protective of a permit holder's rights (i.e., the 'right' to request a Basin Plan amendment) is illusory." The Municipalities point to the record in this case to prove the point: After the dedesignation of Old Alamo Creek was accomplished by Basin Plan amendment, Vacaville requested that the Regional Board initiate a dedesignation of what they characterize as "the next few ditches"—specifically New Alamo Creek, Ulatis Creek, and the upper portion of Cache Slough—to avoid the further imposition of unreasonable regulations. Vacaville then expended substantial sums of money developing the evidence to support the amendment. Nevertheless, the process was halted by the staff of the Boards; according to a Vacaville employee involved in the process, the State Board's staff indicated the decision was based on policy considerations, not legal or technical reasons. Citing this turn of events as an example, the Municipalities argue they have no legal remedy by which they can effectuate the dedesignation of inaccurate beneficial uses because the Porter-Cologne Act does not confer any right to compel regional boards to adopt basin plan amendments (citing § 13320) and does not confer any right of judicial review for *inaction*, but only for an action taken (citing § 13330). This argument fails to consider other judicial remedies.

---

CFR 130.3(b)(6)) and public participation regulations (40 CFR part 25). The proposed water quality standards revision and supporting analyses shall be made available to the public prior to the hearing."

 If an aggrieved party can demonstrate that the regional board has a nondiscretionary duty under the law to take action and has failed or refused to do so, a writ of mandate is available. (Code Civ. Proc., § 1085; *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1268 [4 Cal.Rptr.3d 536] [traditional mandamus may be used to compel an agency to exercise its discretion but not to force the exercise of discretion in a particular manner].) Thus, for example, in *City of Arcadia*, the court concluded that section 13241 imposes obligations on the regional boards that can be enforced by a writ of mandate, in that the statute requires the regional board to consider specific factors in establishing water quality objectives. (*City of Arcadia, supra,* 191 Cal.App.4th at p. 176.)[19] Subject to minimum federal standards (§ 13377), the regional boards have similar statutory obligations in prescribing requirements for discharge permits. They must do so "with relation to the conditions existing in the . . . receiving waters," and "shall take into consideration . . . the provisions of Section 13241" (§ 13263, subd. (a)), which, in turn, require consideration of the "past, present, and probable future beneficial uses of water" (§ 13241, subd. (a)). Further, quite apart from the Regional Board's obligations under § 13241, and as was pointed out in the State Board's order, "where a [Regional Board] has evidence that a designated use does not exist and likely cannot be feasibly attained, it is unreasonable to require a discharger to incur control costs to protect that use." (See Gov. Code, § 11342.2.)

 The State Board's order acknowledges that the Regional Board is obligated, under the Basin Plan, to consider the beneficial uses of tributaries "on a case-by-case basis" rather than applying the uses designated by the 1974 tributary footnote "by rote." And, while the "case-by-case" language does not mean beneficial uses can be revised through the permit process, it also cannot mean that the Regional Board has unfettered discretion to take no action at all. If the language is to mean anything, it must impose upon the Regional Board an affirmative obligation to determine the factual accuracy of a use previously designated by blanket application of the tributary footnote, where such analysis is necessary for rational regulatory action. The blanket

---

[19] In *City of Arcadia*, the court rejected the petitioners' contention that section 13241 applied to a basin plan amendment that added storm water and municipal runoff as discharges to be regulated. Its reasoning, however, is significant. "[I]t is clear under both the Clean Water Act and the Porter-Cologne Act that the focus of a basin plan is the water bodies and the beneficial uses of those water bodies, not the potential sources of pollution for those water bodies. . . . [T]he Porter-Cologne Act requires regional boards to 'formulate and adopt water quality control plans for all areas within the region.' (§ 13240.) Section 13050, subdivision (j) defines a ' "[w]ater quality control plan" ' as applying to the '[b]eneficial uses to be protected' 'for the waters within a specified area.' Merely revising a basin plan to include storm water and urban runoff from municipal storm drains discharging into water bodies already covered by that plan did not trigger the need to comply with section 13241." (*Id.* at. p. 178.) By necessary implication, the formulation of water quality control plans *would* trigger the need to comply with section 13241.

designation was a reasonable approach to a complex problem; it was also, admittedly, "a temporary palliative for the lack of beneficial use information," and in some cases, a "known falsehood." Therefore, the Basin Plan also charged the Regional Board with the responsibility, on a "case-by-case basis" to correct an erroneous designation when circumstances require it, for example, when the board is issuing a permit prescribing discharges into those tributaries. ■ As articulated by the State Board in its order, "[a]t a minimum, where a Regional Board has evidence that a use neither exists nor likely can be feasibly attained, the Regional Board must expeditiously initiate appropriate basin plan amendments to consider dedesignating the use."[20] If the Regional Board unreasonably fails or refuses to do so, mandamus will lie.

■ This does not mean the courts should or will become a kind of "Supervising Board of Water Quality Control." We are acutely aware of the limits of our expertise and of our adjudicatory authority. But if an agency is categorically refusing to carry out its statutory and regulatory obligations in the face of evidence that would require it to take action, the law must provide a remedy. Recently we had occasion to make this very point. "We acknowledge that courts should generally ' "let administrative boards and officers work out their problems with as little judicial interference as possible [because] boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere." ' [Citation.] But this does not mean that boards and officers may refuse to act, or may act with unfettered discretion. 'Mandamus may issue . . . to compel an official both to exercise his discretion (if he is required by law to do so) and to exercise it under a proper interpretation of the applicable law.' [Citation.]" (*California School*

---

[20] The Boards contend that this statement in its order merely "expressed the State Water Board's policy view and indicated what action it would likely take in other cases, [but] did not create a mandatory duty of general application." According to the Boards, this can only be done by the rulemaking process (citing *Rea v. Workers' Comp. Appeals Bd.* (2005) 127 Cal.App.4th 625, 646–647 [25 Cal.Rptr.3d 828]). In fact, Government Code section 11425.60 provides that an agency may designate a decision as "precedent" if it contains "a significant legal or policy determination of general application that is likely to recur. Designation of a decision . . . as a precedent decision is not rulemaking and need not be done under [the statutes governing the rulemaking process.]" Respondents do not dispute that order WQO 2002-0015 is precedential. (See <http://www.swrcb.ca.gov/board_decisions/adopted_orders/water_quality/wqo02.shtml> [as of Aug. 30, 2012].) The Boards argue, however, that the State Board's precedential order on this issue merely "made findings and issued a directive that created a mandatory duty on the part of the Central Valley Regional Water Board to undertake a basin planning action" but did not create a mandatory duty of general application. The plain language of the order indicates otherwise. Although many of the order's determinations are directed narrowly at the Central Valley Regional Water Board, the finding pertaining to this issue (quoted above) refers to the obligations of "a Regional Board" and not just the Central Valley Regional Board. This statement appears to us to be a general legal or policy determination concerning an issue that is likely to recur. In any event, we do not rely solely on the State Board's determination— although we give it great weight—but have ourselves also concluded that the Basin Plan imposes this obligation.

*Bds. Assn. v. State Bd. of Education* (2010) 186 Cal.App.4th 1298, 1327 [113 Cal.Rptr.3d 550].) We thus conclude that mandamus is available to an aggrieved party that can demonstrate that a regional board has refused to comply with its obligations under the basin plan and under the law.

■ The Boards argue that a discharger also has the remedy of requesting that the State Board exercise its power under section 13248 either to amend an erroneous basin plan or order the regional board to do so.[21] They concede that traditional mandamus would lie "if . . . the State Water Board found that the Regional Water Board acted properly or determined that the Regional Water Board acted improperly but the discharger was not satisfied with the remedy the State Water Board ordered." On the other hand, they contend, "[i]f the State Water Board *declines* to exercise its discretion under section 13248 to review a Regional Board's failure to act, no judicial remedy is provided" because the statute does not require the State Board to take any action at all. "A broader application of section 13248 would eviscerate the plain, permissive language of section 13248. . . ." We need not decide whether the State Board's declination to act gives rise to a judicial remedy, however, because the Boards' interpretation of section 13248 is consistent with our conclusion that mandamus will lie where a discharger is not satisfied with a determination by either the regional or the State Board not to amend the basin plan.

■ The Municipalities contend the mandamus remedy is inadequate. They point out that, while a court can strike down an arbitrary regulation (such as a beneficial use), it cannot compel the exercise of future discretion in a particular manner; therefore, even if mandamus would lie to force a regional board to *initiate* a basin plan amendment, it cannot order the board to *adopt* a particular amendment. As we have already noted, an agency can be ordered to exercise its discretion "under a proper interpretation of the applicable law." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].) "Where only one choice can be a reasonable exercise of discretion, a court may compel an official to make that choice." (*California Correctional Supervisors Organization, Inc. v. Department of Corrections* (2002) 96 Cal.App.4th 824, 827 [117 Cal.Rptr.2d 595].) But where the facts and the law in a case permit more than one choice, it is properly left to the agency to make that choice. (*California State*

---

[21] Section 13248 provides: "(a) At any time, the state board may, on its own motion, review the regional board's failure to act under this article. [¶] (b) The state board may find that the failure of the regional board to act was appropriate and proper. Upon finding that the failure of the regional board to act was inappropriate or improper, the state board may direct that appropriate action be taken by the regional board, refer the matter to another state agency having jurisdiction, take appropriate action itself, or take any combination of those actions. In taking any action, the state board is vested with all the powers of the regional boards under this division."

*Employees' Assn. v. Way* (1982) 135 Cal.App.3d 1059, 1066 [185 Cal.Rptr. 747] [court will not impose its own policy judgment on a quasi-legislative agency in the absence of an arbitrary decision].) That legal principle, however, does not render the mandamus remedy inadequate.[22]

### b. *Resolution No 88-63*

In addition to the tributary language, the Basin Plan also provides that "[w]ater bodies . . . that do not have beneficial uses designated in Table II-1 are assigned MUN designations in accordance with the provisions of State Water Board Resolution No. 88-63 which is, by reference, a part of this Basin Plan." The Municipalities challenge the Boards' reliance on resolution No. 88-63, the "Sources of Drinking Water" policy, which the OAL disapproved as an improper underground regulation.[23] The parties dispute vigorously whether resolution No. 88-63 is valid in light of the OAL's action. This issue is not dispositive, however. The Municipalities do not dispute that the 1995 Plan, which assigned MUN uses to all unnamed waters, went through the appropriate public hearing process and was approved by the OAL. In any case, as we have already concluded, the State Board reasonably treated the water bodies at issue here as being assigned MUN uses and required rulemaking procedures before changing beneficial uses. However, for the reasons already discussed, mandamus will lie to compel the boards to comply with their responsibility to undertake an inquiry into the accuracy of a use designation—whether based on the tributary footnote or on the assignment of MUN uses to all unnamed waters—when necessary for rational regulatory action, and to process changes in a designation where it is compelled by the evidence.

### c. *Conclusion*

In sum, we reject the Municipalities' challenge to the use designations of the water bodies at issue here. Where, however, there is evidence that

---

[22] The remedy of traditional mandamus is, of course, in addition to the right of a discharger to challenge the provisions of its discharge permit by way of administrative mandamus, subject to the exhaustion requirements of section 13320. (§ 13330.) Thus, a discharger may, in effect, challenge the basin plan as applied to the discharge permit. As the Boards acknowledge, "[a]n as-applied challenge lies where the particular application of a regulation—the Basin Plan in this case—is not a reasonable interpretation of the underlying statute. . . ." In other words, the discharger can seek review of the Regional Board's "quasi-adjudicative act[s] of interpreting the basin plan and developing permit requirements." In such cases, the court is directed to apply its independent judgment. (§ 13330, subd. (e).) The discharger can be protected from incurring the costs of complying with the new permit that is based upon an improper beneficial use by requesting a stay of the permit requirements from the State Board and, if it is denied, from the court. (§ 13321.)

[23] Resolution No. 88-63 provided that all surface and groundwaters of the state were considered to be suitable, or potentially suitable, for municipal or domestic water supply and should be so designated.

the beneficial use designated is not feasibly attainable, it is the agency's obligation to undertake the actions necessary to ascertain and designate the appropriate beneficial uses.

D. *Incorporation by Reference*

The Municipalities contend that in two particulars, the Water Quality Objectives portion of the Basin Plan improperly incorporates by reference standards and criteria of other agencies. First, they challenge the requirement that waters designated for MUN use not contain concentrations in excess of the maximum contaminant levels (MCL's) specified in certain tables in title 22 of the California Code of Regulations adopted by the State Department of Health Services (DHS);[24] the Basin Plan specifies that "[t]his incorporation-by-reference is *prospective*, including future changes to the incorporated provisions as the changes take effect." (Italics added.) The regulations in question set standards for contaminants in public water systems or water supplied to the public. (Cal. Code Regs., tit. 22, §§ 64431, 64444, 64449.) The Municipalities' second challenge is to the provision that "[t]otal identifiable persistent chlorinated hydrocarbon pesticides shall not be present in the water column at concentrations detectable within the accuracy of analytical methods approved by the [EPA] or the Executive Officer [of the Regional Board]."

The Municipalities first argue the Regional Board adopted the DHS standards without taking into account the necessary factors. Section 13241 requires the Regional Board to consider various factors in setting water quality objectives, including: "(a) Past, present, and probable future beneficial uses of water. [¶] (b) Environmental characteristics of the hydrographic unit under consideration, including the quality of water available thereto. [¶] (c) Water quality conditions that could reasonably be achieved through the coordinated control of all factors which affect water quality in the area. [¶] (d) *Economic considerations*. [¶] (e) The need for developing housing within the region. [¶] (f) The need to develop and use recycled water." (Italics added.) The Municipalities contend the record contains no evidence the Regional Board considered economic factors before incorporating the provisions governing the minimum standards for protecting an MUN designation.

 "Section 13241 does not specify how a water board must go about considering the specified factors. Nor does it require that board to make specific findings on the factors." (*City of Arcadia, supra*, 191 Cal.App.4th at p. 177.) "Generally, '[i]t is presumed that official duty has been

---

[24] Effective July 1, 2007, certain functions of the State Department of Health Services were transferred to the State Department of Public Health. (See Health & Saf. Code, § 131050.) In this opinion, we will refer to the former name, DHS.

regularly performed.' (Evid. Code, § 664; see *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 976 [3 Cal.Rptr.2d 643] ['the relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the board] *failed* to comply with the requirements of its . . . regulatory program' and, '[i]n the absence of contrary evidence, we presume regular performance of official duty'].)" (*City of Arcadia, supra*, 191 Cal.App.4th at p. 177.)

The Municipalities essentially contend that each and every component part of the Water Quality Objectives must be tied to an economic analysis. They argue, "[t]he [Regional Board] simply incorporated the DPH MCLs, and 'detectable' concentration based on later-approved laboratory techniques, without any independent analysis of each of the factors required by Water Code [section] 13241. The [board] did not attempt to determine the cost of compliance, balance public interest factors, or create an implementation plan *for these specific WQOs.*" (Italics added.) But the Municipalities cite no statute or case to support this contention. They point only to *Morris v. Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697], which stands for the unremarkable proposition that "[a]dministrative regulations that violate acts of the Legislature are void . . . ."

The Municipalities do not assert that the Regional Board failed to consider economic factors in adopting the water quality objectives as a whole. And, the Boards make the point that the development of the water quality objectives at issue was not an event, but a process that began in 1971 and continued through the adoption of the 1995 plan. According to the Boards, "the 1975 Basin Plan contains essentially the same water quality objective for 'chemical constituents' that incorporates the DHS drinking water standards and essentially the same 'non-detectable' chlorinated hydrocarbon pesticide objective that sets forth the analytical methods to be used." They argue, further, that the record of the 1971 interim plan and the 1975 Basin Plan are replete with discussions of the factors required to be considered by section 13241, including economic considerations. We agree. Although the Boards failed to provide specific record cites to support this contention, our review of the hundreds of pages cited does show multiple instances in which economic considerations are discussed. For example, the 1975 plan contains a discussion of the effect of water quality regulation on employment and economic development, an analysis of 17 proposed actions, including the cost of each, and an examination of alternative actions and their comparative costs.[25]

---

[25] A review of the 1975 and 1995 plans shows that, in general, WQO's (water quality objectives) are not discreet items adopted in a vacuum, but are part of a complex array of historical, geographical, technical and practical considerations, all of which are dynamic and, to some degree, subject to further analysis as the objectives are implemented. (See, for

In reply, the Municipalities argue that these pages do not show that the State Board considered the section 13241 factors "for the WQOs at issue." To demonstrate their point, the Municipalities (1) refer generally to a memorandum from the State Board's chief counsel advising how the board should comply with its obligation to take economic considerations into account when adopting water quality objectives and (2) cite to a basin plan amendment described in *City of Arcadia*, as an example of a State Board action that specifically considered the cost impact on regulated parties. (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1416–1417 [38 Cal.Rptr.3d 373].) Without more, neither is of any particular relevance to the matter before us.

What is missing from the Municipalities' analysis is any citation to the record supporting the premise that the challenged WQO's, when adopted, would have had an economic impact that should have been considered under section 13241. As was explained in the chief counsel's memorandum, the regional water board, in making its assessment of the cost impacts of a proposed objective, should "review currently available information . . . [and] consider and respond on the record, to any information provided by dischargers or other interested persons regarding the potential cost implications of adoption of a proposed objective. [¶] If the economic consequences of adoption of a proposed water quality objective are potentially significant, the Boards must articulate why adoption of the objective is necessary to ensure reasonable protection of beneficial uses."

Here, there is no threshold showing that there were any adverse economic consequences to the adoption of the WQO's in question, which would have triggered the obligation of the Regional Board to "articulate why adoption of the objective is necessary to ensure reasonable protection of beneficial uses." The Municipalities have not pointed to anything in the record supporting the adoption of the WQO's indicating that the challenged standards would result in any onerous or unusual costs for regulated parties, so there is no basis upon which we can conclude that the absence of a discussion of costs on that subject is statutorily meaningful.

In short, the Municipalities have not satisfied their affirmative obligation to show the Regional Board in fact failed to meet its statutory duty. They do not direct our attention to any staff reports, findings, resolutions, or other documents that would assist us further in determining what factors the Regional Board considered—or failed to consider—either in adopting the WQO's in 1975, or at any point thereafter. Nor do they cite to any portion of the record suggesting that the cost of the WQO's at issue was a matter of concern or dispute. The record in this case is extensive, filling more than 19

example, the discussion of Water Quality Objectives and the description of the Policy for Application of Water Quality Objectives in the 1995 Plan.)

boxes and encompassing approximately 178 volumes of documents. It is not our duty to comb the record to find error. (*Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1140–1141 [135 Cal.Rptr.2d 796].) We shall therefore presume that in adopting the water quality objectives, the Regional Board complied with the law.

The Municipalities also argue that, even if the Regional Board properly considered all the factors required under section 13241, the incorporation by reference of the DHS standards improperly includes future changes to the referenced standards and analytical methods. They argue that this prospective incorporation prevents the regional boards from considering economic factors if the DHS changes its standards, in violation of sections 13241 and 13242. That is, according to the Municipalities, the effect of the prospective incorporation by reference is to incorporate future changes to those standards automatically without the Regional Board—or the DHS, for that matter—taking into account the economic effects on dischargers.

The Municipalities rely on *California Assn. of Nursing Homes etc., Inc. v. Williams* (1970) 4 Cal.App.3d 800 [84 Cal.Rptr. 590] (*California Assn. of Nursing Homes*). The court there considered the validity of a regulation of the Department of Health Care Services (the Medi-Cal agency) prescribing the standards for state payments for the care of Medi-Cal patients in nursing and convalescent homes. (*Id.* at p. 805.) The regulation incorporated by reference the contents of a document entitled "State Schedule of Maximum Allowances" for long-term care facilities, found in a pamphlet issued by the Department of Finance, which was not included in the California Administrative Code. (*Id.* at p. 808.) Reimbursement was fixed in accordance with the schedule of maximum allowances in effect at the time services were provided. (*Id.* at p. 808 & fn. 5.) The schedule of maximum allowances "appear[ed] to be the result of ex parte studies by staff personnel of the Department of Finance." (*Id.* at p. 813.)

The court concluded the Medi-Cal agency had not complied with public hearing requirements, noting that there was no formal administrative record of the evidence the Medi-Cal administrator relied on in adopting the regulation, and concluding that the failure to assemble an evidentiary record was compounded by the incorporation by reference of the schedule of maximum allowances. (*California Assn. of Nursing Homes, supra,* 4 Cal.App.3d at pp. 812–813.) The court reasoned that the Medi-Cal agency's "adoption of the [Department of Finance's] fiat without independent consideration of the underlying evidence and without public or judicial access to it transgresses fundamental demands for the adoption of administrative regulations. [¶] Compliance with the public hearing demand precludes promulgation in the inner chambers of government offices, whether of the administering or fiscal

agency." (*Id.* at pp. 813–814, fn. omitted.) The court continued: "There is no procedural barrier prohibiting the enacting agency from adopting by reference a set of standards issued by another agency if supporting evidence is made available at a public hearing, opportunity for refutation is given, the pro and con evidence considered and the evidentiary material assembled in an identifiable record. On the other hand, *an attempt to embody by reference future modifications of the incorporated material without additional hearings would have dubious validity.* [Citation.]" (*Id.* at p. 814, italics added.)

 Applying these principles, the Legislature has given the DHS the responsibility to administer "all . . . provisions relating to the regulation of drinking water to protect public health" (Health & Saf. Code, § 116350, subd. (a); see Health & Saf. Code, § 116275, subd. (b)), and the MUN beneficial use designation is, as the OAL noted in a 1995 memorandum, "inextricably tied to California drinking water standards." The Boards could reasonably conclude that the drinking water standards in title 22 of the California Code of Regulations would protect MUN beneficial uses. And unlike the State Schedule of Maximum Allowances at issue in *California Assn. of Nursing Homes*, the drinking water standards adopted by the DHS must be adopted pursuant to the APA, which provides for public participation. Under the circumstances of this case, we conclude that prospective changes in the drinking water standards promulgated by the DHS were properly incorporated by reference.

We reach the same conclusion with respect to the Basin Plan's provision that persistent chlorinated hydrocarbon pesticides not be present at concentrations detectable within the accuracy of analytical methods approved by the Regional Board's executive officer. The standard is that such pesticides not be detectable. We see no impropriety in leaving the *method* of determining compliance with this requirement to the executive officer. In *Russian River Watershed Protection Committee v. Santa Rosa* (9th Cir. 1998) 142 F.3d 1136, 1138, 1141–1143, the Ninth Circuit considered a challenge to a regional board's executive officer's selection of a method for measuring waterflow in order to determine compliance with NPDES permits. The appellants apparently contended, as the Municipalities do here, that the executive officer's authority violated section 13223, subdivision (a), which allows a regional board to delegate any of its powers to its executive director except, among other things, the issuance, modification, or revocation of a water quality control plan, water quality objectives, or waste discharge requirement. (142 F.3d at p. 1143 & fn. 2.) The Ninth Circuit rejected the challenge, noting that there were no cases interpreting that statutory provision, but that under federal law, "the establishment of a method of compliance with an NPDES permit does not constitute a modification of the permit." (*Id.* at p. 1143.) Here, as well, the Regional Board could properly leave to the executive officer the determination of the method of complying with the permit.

## IV. DISPOSITION

The judgment is affirmed without prejudice to any right Vacaville may have to seek further amendments to the Basin Plan or initiate further proceedings.

Reardon, Acting P. J., and Sepulveda, J.,* concurring.

A petition for rehearing was denied September 27, 2012, and the opinion was modified to read as printed above.

---

*Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.